SUMMERFIELD, Postmaster General et al. v. CIVIL AERONAUTICS BOARD.

WESTERN AIR LINES, Inc. v. CIVIL AERONAUTICS BOARD.

Nos. 11259, 11324.

United States Court of Appeals for the District of Columbia Circuit.

Argued Dec. 5, 1952.

Decided May 4, 1953.

Writ of Certiorari Granted Oct. 12, 1953.

See 74 S.Ct. 49.

Mr. Daniel M. Friedman, Special Asst. to the Atty. Gen., Department of Justice, pro hac vice, by special leave of Court, with whom Mr. Newell A. Clapp, Acting Asst. Atty. Gen., Department of Justice, was on the brief, for petitioners in No. 11259. Mr. Charles H. Weston, Chief, Appellate Section of the Antitrust Division, Department of Justice and Mr. William E. Kirk, Jr., Asst. U. S. Atty., Washington, D. C., at the time of argument, also entered appearances in behalf of the petitioners in No. 11259.

Mr. Hugh W. Darling, Los Angeles, Cal., for petitioner in No. 11324. Mr L. Welch Pogue, Washington, D. C., also

entered an appearance in behalf of petitioner in No. 11324.

Mr. O. D. Ozment, Attorney, Civil Aeronautics Board, Washington, D. C., with whom Mr. Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, Washington, D. C., was on the brief, for respondent. Mr. John H. Wanner, Associate General Counsel, Civil Aeronautics Board, Washington, D. C., also entered an appearance in behalf of respondent.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

These cases concern orders of the Civil Aeronautics Board which fixed the compensation of Western Air Lines for the transportation of mail from May, 1944, through December, 1948. The dispute revolves about Section 406 of the Civil Aeronautics Act.[1] The proper treatment of several matters is involved.

Principally the petitions concern the treatment of the profit derived by Western from the sale to United Air Lines of a certificate for an air route and certain equipment used in connection therewith. Prior to September 15, 1947, Western owned a certificate for Route 68 —between Los Angeles and Denver. After a hearing the Civil Aeronautics Board approved the sale of the route and the equipment to United Air Lines [2] for a total price of $3,750,000. Of this $722,000 [3] was then computed as profit on the sale of tangibles and $447,000 as profit on the sale of intangibles. The Board decided that the transfer of the route at the amount to be paid by United was in the public interest, because the profit on the transaction would provide the necessary incentive for Western to make a sale and the purchasing carrier could operate the property to greater advantage to the public. The Board acted upon the premise that it has no power to force a carrier against its will to transfer property to another carrier; its only power to influence such transfers is the power of inducement. It decided that a profit on a sale would be such an inducement. Hence it approved the sale.

When the Board came, in the present proceeding, to the determination of compensation to Western for the transportation of mail, a problem arose as to the treatment of this profit in the computations.

The statute, in pertinent part, provides:

"(a) The Board is empowered and directed * * * to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft * * *.

"(b) * * * In determining the rate in each case, the Board shall take into consideration, among other factors, * * * the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense." [4]

The statutory language which is critical in the present dispute is "the need of each such air carrier for compensation * * * sufficient * * *, together with all other revenue of the air carrier, * * * to maintain and continue the development of air transportation".[5]

1. 52 Stat. 998 (1938), as amended, 49 U.S.C.A. § 486.

2. United-Western, Acquisition Air Carrier Property, 8 C.A.B. 298 (1947).

3. Later recomputed to be $648,102.

4. Supra note 1.

5. Of course the statute provides, in effect, for a minimum which is actual compensa-

Perhaps the problem is made clearer by use of a little simple arithmetic. If a carrier has $1,000,000 in revenue and $1,300,000 in expenses, obviously it needs $300,000 to break even; the "break even need". Then it needs a return on its investment and some working capital; let us say $200,000 for those needs. The statute says that the carrier should receive the amount needed not only to insure the performance of the service but also to enable it to continue the development of air transportation. Let us suppose that for the latter purpose the carrier needs another $100,000. In sum the carrier needs $600,000. Now, obviously, in this calculation the greater the amount of the carrier's existing revenues, the less the amount it needs by way of additional mail pay; and the less the revenues the greater the additional mail pay. So the inclusion of a given amount in revenues lessens the mail pay by that amount, and the omission of an amount from revenues increases the needed mail pay. Such is our present problem.

The Board at first decided that the entire profit on the sale of Route 68 was "other revenue", and it included this amount as revenue in calculating the amount of mail pay needed by Western. The effect was to reduce the mail pay by that amount. Upon reconsideration the Board changed its position. It included the profit from the sale of tangibles as "other revenue" in its calculation, but it did not include the profit from the sale of intangibles. The effect was to reduce mail pay by the amount of the profit on the tangibles, but the profit on the intangibles was left out of the calculation entirely.

■ The Postmaster General is a party in interest by reason of the duties in respect to mail pay imposed upon him by the statute.[6] He says the Board was in error in its treatment of the profit on the intangibles. Western says the Board was in error in its treatment of the profit on the tangibles. The Postmaster General would include in revenues the entire profit on the sale of the route and the equipment. Western would exclude the entire profit from revenues in the calculation.

We turn first to the problem of the profit on the tangibles. This was a gain derived from the sale of capital assets. As such it was "income" within the meaning which that term has had ever since Doyle v. Mitchell Bros. Co.[7] But our problem is whether it was "revenue" within the meaning of this rate-making statute. We think the answer should be sought chiefly in the substantive meanings of the statutory provisions rather than in the semantics of the phrases.

■ The difficulty of the problem arises because this proceeding is to determine a rate of compensation for a past period. Ordinarily, of course, rates are fixed for the future. We think it clear that the profit from an isolated past sale of capital assets could not be included in a calculation of compensation to be paid in future years for carriage of the mail. It would not be anticipated revenue in the future period. With that proposition the Board agrees. In fixing the rate for the future it has considered as revenue only reasonably anticipated items.

■ Western bases its foremost argument upon the foregoing as a premise. It insists that the present proceeding is a rate-making proceeding and nothing else; that a rate-making proceeding must be, in contemplation of law, rate-making for the future—a prospective rate-making, since, it says, rate-making is inherently a prospective concept. The Board itself has several times so held. And, of course, that is a generally accepted view as to utility rates. There is great power in that argument.

tion for service performed. That payment is not in dispute here.

6. Sec. 406 of the Act, 52 Stat. 998 (1938), 49 U.S.C.A. § 486.

7. 1918, 247 U.S. 179, 38 S.Ct. 467, 62 L. Ed. 1054.

But we are impressed by the practical aspects of the situation. In this instance the Board was in fact looking at a period which had passed. The actual facts as to revenues and expenses for that period were known. The actual need, or lack of it, of the carrier in that period was known. In saying that the Board was looking at a past period we are not departing from the rule in the T. W. A. case.[8] The period began when the petition for the rate-making was filed, i. e., May, 1944; as of that date the rate-making was prospective. When the Board got around to making its findings and decision the period 1944–1948 was past. It is to the latter actuality that we refer.

■ At this point the two different considerations embodied in this statute must be noted. The statute provides for actual compensation for the service performed in carrying the mail—a so-called service rate. This is the ordinary purpose of a utility rate. It involves reimbursement for expenses incurred in performing the service, return on the investment used in the service, and a reasonable profit on the transaction. This much is due whether the service is past or future. In the case at bar no dispute arises in respect to that phase of the matter.

But this statute adds to these ordinary features of a utility rate another consideration. It provides that the pay for carrying the mail shall be sufficient to meet the carrier's need. It describes that need as being for funds to perform the service of carrying the mail and also to maintain and develop air transportation. The problem under this provision of the statute is: How much does the carrier need? The answer depends upon (1) the gross, or total, need in dollars and (2) how much the carrier will have outside of mail pay.

In the ordinary case, where the rates are for the future, the revenue of the carrier must be anticipated. But where the pay is being computed for a past period may the Board accept as a fact that which it knows to be a fact, or must it ignore the known fact and compute the rate as though it were looking at the unknown future as of the date of the beginning of the period? The Board knew, and we all know, that Western had in this period this $1,000,000, or thereabouts, in profit. That profit was derived from the disposition of assets acquired for or created by its operations under its certificate.

Let us suppose, as was the case in the basic findings here, that Western's total non-mail revenue was about $33,000,000 and its total operating expenses were about $36,000,000. How much does it need? How much does it need if, in addition to the $33,000,000, it also has a special profit of $1,000,000? Does it actually need $3,000,000, or does it actually need only $2,000,000?

The gist of the answer lies in the fact that we are to determine "need". We are not determining merely adequate compensation for services rendered, in the ordinary public utility sense. To be sure, the payment is cast by the statute as a rate, and the process as a rate-making. But even so the Supreme Court held in the West Ohio Gas case[9] that, when the period under consideration has passed, fair and reasonable rates should be ascertained from what is known and not from a *nunc pro tunc* estimate. In the case now before us the disputed basic consideration is a need, a need beyond the requirements of fair compensation for a service performed, not dependent upon the amount or the nature of the service rendered. *A fortiori*, from the West Ohio Gas case, the amount of need for a period which has passed must be ascertained in the light of known facts.

■■ It seems to us that under this statute the Board, in fixing a rate of compensation for a past period, may view the facts as it knows the facts to be, that in determining "need" it is not com-

8. Transcontinental & Western Air v. Civil Aeronautics Board, 1949, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911.

9. West Ohio Gas Co. v. Public Utilities Comm. (No. 2), 1935, 294 U.S. 79, 82, 55 S.Ct. 324, 79 L.Ed. 773.

pelled to ignore that which it knows. We conclude that in ascertaining Western's need for the period May, 1944, to December, 1948, the Board was permitted to take into consideration the fact that Western had this profit in that period from the sale of these assets.

We fully realize that our view of the statute will give rise to difficulties in respect to losses and also in respect to unusual or unanticipated earnings. The rule may make too much depend, from the standpoint of the carrier, upon tactical decisions whether and when to file petitions for rate-making. But we think such possibilities cannot negative statutory terms. Moreover other difficulties arise from any other rule. And, again, it seems to us that much of the anticipated difficulty can be prevented by expedition on the part of the Board, so that what is prospective in legal theory will be prospective in actual fact. If expeditious disposition of petitions does not meet the troubles arising from the rule, it is always possible that Congress may change the statutory provision. Our part is done when we conclude what Congress meant by the provision now before us.

We turn next to the treatment of the profit on the intangibles. The Board did not find, and it does not claim now, that Western itself needs the additional amount of mail pay which is shown when the profit on the sale of the intangibles in this transaction is omitted from "other revenue" in the computation. The claim of the Board is that it can allow Western to exclude this sum from stated revenues in order to encourage other carriers (not Western) to follow a given course of action. The Board said, in its opinion in the present case, that it wished to emphasize that the "decision not to include the net profit from the sale of intangibles was reached solely because we are thus seeking to encourage improvement of the air route pattern through voluntary route transfers by other air carriers. In other words, we have decided not to offset this profit against the carrier's need because

we are seeking in this way to spur the development of a self-sufficient air transport industry."

We recognize the force of the Board's description of the desirability of encouraging carriers to transfer routes and other property. But we cannot find in the statute any power conferred upon the Board to do so in fixing mail pay. We do not find any mail pay provision which is authority for the Board to provide incentives to the industry generally for the development of air transportation through the voluntary actions of carriers.

In the first place, the language of the statute sharply limits developmental allowances to the needs of the carrier under consideration. (1) The statute speaks of the "need" of the carrier. It does not speak of the desirability of allowances. It does not speak of purely bonus awards. (2) It speaks of "each" air carrier and compensation sufficient to enable "such air carrier" to develop. The statute is not cast in terms applicable to the general field of air transportation but to the situation in which each air carrier finds itself. (3) The statute provides that the mail pay shall be sufficient "to enable" the air carrier to maintain and continue development. This is a sharply limited expression. It does not extend to bonus awards which might be encouraging to the industry generally. Thus we think that, while the so-called "need" provision of the statute, above quoted, does provide for the payment of sums sufficient to enable the carrier under consideration to maintain and continue development of air transportation, such payments are restricted to the need of each individual carrier to maintain and continue a development program of its own.

In the second place, the Supreme Court held in the T. W. A. case, supra, that the mail pay provisions of this statute describe a rate-making authority, and the Court said that the statutory language does not suggest that Congress intended to break with the traditions of public utility rate-making. Allowances de-

signed as developmental incentives for the utility whose rates are being determined are quite common in public utility rate-making. But the award of bonus subsidies for the purpose of encouraging an industry generally to follow courses deemed desirable by the regulatory authority is a vast departure from rate-making. Mr. Justice Jackson made this distinction indisputably clear in his dissent in the T. W. A. case. He was of the opinion that in these provisions of the statute Congress intended to subsidize the carriers and to underwrite their revenues. We think that the decision in the T. W. A. case as to the nature of the mail pay provisions leaves no room for bonus subsidies not connected with the particular carrier's own need. So the statute does not support the theory upon which the Board desires to go in this proceeding in respect to the profit from the intangibles.

We must conclude, therefore, on this point that the Board was in error in the theory upon which it excluded from the calculation the profit from the sale of the intangibles.

The parties dispute the Board's treatment of federal income tax liabilities in its computation of the mail pay. The tax liability upon an estimated basis as of the beginning of the period was some $600,000. It developed that, due to carry-back losses and other provisions of the federal tax statutes, Western had little or no tax liability for this period. In its final orders on mail pay the Board acted upon the latter basis of fact. We think it was correct in doing so. The preceding discussion is sufficient as a statement of our reasons.

Western also asserts that the Board erred in including as "other revenue" in the calculation of mail pay the profits derived from the operation of restaurants and slot machine concessions at its airports. We think the Board was clearly correct in this treatment. When the statute says "all other revenue" it must mean to include revenue derived from activities incidental to the operation of the airline. Whether it would also include revenue from activities un-connected with airplane operation is a question not before us and upon which we intimate no opinion.

Western asserts as reversible error the decision of the Board to fix in this proceeding the mail pay beginning in May, 1944. Western says that the consideration should have begun as of January 1, 1946. But the Board has power under the statute, Sec. 406(a), to "make such rates effective from such date as it shall determine to be proper", and the Supreme Court held in the T. W. A. case that that clause empowered the Board to go back as far as the date of the filing of the petition. That is what the Board did in this case. Western filed its petition for redetermination of mail pay on May 1, 1944.

We add one further comment in regard to the expressions "offset", "deduction" and "recapture" used by the parties in describing the treatment of the profit from the sale of the assets if it be included in revenue. The phraseology would not be important if it did not embody erroneous ideas. The need which this statute contemplates is a net figure; the extra amount which appears necessary over and above that which the carrier has. The process provided by the statute is for an affirmative ascertainment of that need. The need is not a gross figure from which offsets or deductions are made. Thus the passenger revenue, etc., is not "offset" against or "deducted" from the need of the carrier. None of the earned revenue is recaptured. The bare, uncomplicated situation is that when the carrier has substantial revenues from non-mail sources the margin of its need for mail pay is less. In practical dollar effect, and perhaps in accounting entries, the treatment may be set up as a gross need with offsetting items, and so it takes on an appearance of recapture. But the legal contemplation of the statute is not that, and the use of the quoted terms leads to erroneous reasoning.

The necessity for reconsiderations, redeterminations and recalculations in the light of this opinion causes us to remand the matter to the Board. The remand is

to enable the Board to determine, in the light of this opinion and pursuant to the statutory terms, the amount of compensation to be paid Western for the transportation of mail during the period here involved—May, 1944, to December, 1948.

Affirmed in part, reversed in part, and remanded.

BAZELON, Circuit Judge (concurring).

I agree with the court's opinion and its comment that the rule we adopt in construing the statute "will give rise to difficulties in respect to losses and also in respect to unusual or unanticipated earnings" [1] but I am unable to agree that "much of the anticipated difficulty can be prevented by expedition on the part of the Board." [2] I think these difficulties or "other difficulties [which might] arise from any other rule" [3] are inherent in the statute and will persist so long as there is no express differentiation therein between compensation for mail service and need payments to subsidize the development of air transportation. This is so because the absence of such a distinction, says the Supreme Court, requires the application of traditional principles of rate making.[4] The effect of this is to make applicable to subsidy as well as compensation payments the familiar principle that "past excessive earnings belong to the [carrier] just as past losses must be borne by it." [5] Therein lies the mischief. For that principle derives its validity from the premise that rates are calculated to allow for some financial risk on the part of the public utility.[6] But since the very purpose of need or subsidy payments is to remove any vestige of risk, that principle has no place in fixing such non-rate payments.

1. Majority opinion, 92 U.S.App.D.C. 253, 207 F.2d 205.

2. Ibid.

3. Ibid.

4. Transcontinental & Western Air v. Civil Aeronautics Board, 1949, 336 U.S. 601, 605, 69 S.Ct. 756, 93 L.Ed. 911.

5. Washington Gas Light Co. v. Baker, 1950, 88 U.S.App.D.C. 115, 125, 188 F.2d 11, 21, certiorari denied, 1951, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686. And see my concurrence this day in Summerfield v. Civil Aeronautics Board, 92 U.S. App.D.C. 256, 207 F.2d 207.

6. Ibid, and cases cited in note 15 therein.