SUMMERFIELD, Postmaster General, et al. v. CIVIL AERONAUTICS BOARD et al.

No. 11351.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 5, 1952.

Decided May 4, 1953.

Writ of Certiorari Granted Oct. 12, 1953.

See 74 S.Ct. 48.

Prettyman, Circuit Judge, dissented.

Mr. Daniel M. Friedman, Special Asst. to the Atty. Gen., Department of Justice, *pro hac vice*, by special leave of Court, with whom Mr. Newall A. Clapp, Acting Asst. Atty. Gen., Department of Justice, was on the brief, for petitioners. Messrs. Charles H. Weston, Chief, Appellate Section of the Antitrust Division, Department of Justice, and William E. Kirk, Jr., Asst. U. S. Atty., Washington, D. C., at the time of argument, also entered appearances in behalf of the petitioners. Mr. H. Graham Morison, Asst. Atty. Gen. at the time the record was filed, also entered an appearance in behalf of the petitioners.

Mr. O. D. Ozment, Attorney, Civil Aeronautics Board, Washington, D. C., with whom Mr. John H. Wanner, Acting General Counsel, Civil Aeronautics Board, Washington, D. C., was on the brief, for respondent. Mr. Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, Washington, D. C., also entered an appearance in behalf of the respondent.

Mr. William A. Roberts, Washington, D. C., with whom Messrs. Harold A. Kertz, James E. Wilson and Mrs. Irene Kennedy, Washington, D. C., were on the brief, for the intervenor, Chicago and Southern Air Lines, Inc.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

PROCTOR, Circuit Judge.

This case is before us to review an order of the Civil Aeronautics Board fixing mail pay rates for Chicago and Southern Air Lines' Latin American routes.[1]

In July, 1948, the Board fixed final rates for the carrier's domestic routes. These included a prospective rate commencing January 1, 1948, estimated to yield a net return, after taxes, of 7.4% on the carrier's investment allocable to domestic operations. Actually the aver-

---

1. The pertinent parts of the Civil Aeronautics Act of 1938, §§ 406(a) and (b), 52 Stat. 998, Reorg. Plan No. IV of 1940, 54 Stat. 1235 (1940), 49 U.S.C.A. § 486, provide as follows:

"Sec. 406. (a) The Board is empowered and directed, upon its own initiative or upon petition of the Postmaster General or an air carrier, (1) to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft * * * and the rates so fixed and determined shall be paid by the Postmaster General from appropriations for the transportation of mail by aircraft.

"(b) In fixing and determining fair and reasonable rates of compensation under this section, the Board, considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the Board shall take into consideration, among other factors, the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transporation [*sic*] of mail; such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

age yield for the years 1948 through 1950 was 12.51%, or $654,000 more than estimated.

Later, October 18, 1951, the Board ordered final mail rates for the carrier's Latin American routes, retroactively from November 1, 1946 to December 15, 1950, and prospectively from December 16, 1950. These rates were estimated to yield a net return of 7% for the past period and 10% for the future. In determining the same the Board refused, for what it termed "sound reasons * * * of economic policy," (J. A. 54), to offset the carrier's excess profits of $654,000 from its domestic routes against "need" or subsidy requirements for the international operations (J. A. 53). The refusal to make the offset forms the basis of this appeal.

Although the brief filed in behalf of the Board carries an intimation (p. 12) that refusal to offset the carrier's excess domestic profits may be supported under § 406(b) permitting "different rates for * * * different classes of service", findings and conclusions of the Board reveal no such reason. Their action is explained in these words:

"The public interest in maintaining and furthering the incentive to carriers generated under forward final rates leads us to the conclusion that at this time, *without review of any question of power* but simply as a matter of policy, we should not offset the profits of the domestic division of C & S earned under the closed rate in establishing the mail rate for the international operation." [Emphasis added.]

(J. A. 21. See also J. A. 53.)

Thus it appears that the Board was initiating a new "incentive" policy without consideration of its authority under the Act to adopt a plan which omitted an offset of the excess profits arising from domestic operations.

The Postmaster General does not question the Board's authority to fix rates separately for different operating divisions of the carrier, but he does insist that the end result of fixing rates for a carrier must not go beyond that point where the total subsidy exceeds the need of the carrier as a whole. We agree with this contention.

In our opinion failure of the Board to make the offset is at variance with the plain meaning of § 406(b). That section speaks in terms of a carrier as a single entity; not as divisible units conducting separate operations. This meaning is clearly reflected in the requirement that "In determining the rate [of mail pay] in each case, the Board *shall* take into consideration * * * the need of each such air carrier for compensation * * to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier"[2] to meet the declared objectives of the Act. Accordingly, in determining the "need" requirements of Chicago and Southern Air Lines for its Latin American routes the Board must consider "all other revenue of the air carrier". Admittedly the excess profit of $654,000 derived from domestic operations is part of that revenue, so refusal of the Board to "take" the item "into consideration" in determining a rate for the Latin American routes results in allowing the carrier $654,000 more than its actual need, in disregard of the statutory requirement to keep subsidy allowances within those bounds.

Heretofore the Board has treated an air carrier as "the primary unit around which the national air transportation system was to be developed through the instrumentality of air mail compensation," and the "need" as "that of the air carrier as a whole and not that of any particular geographical division of its operations." Chicago and Sou. A. L., Mail Rates—Route Nos. 8 and 53, 3 C.A.B. 161, 190 (1941). This principle was reaffirmed in Pan Am. Airways, Inc., Alaska Mail Rates, 6 C.A.B. 61, 67 (1944), wherein the Board denied subsidy mail pay on the Airways' Alaska

2. Emphasis added.

division because excess earnings from its more profitable divisions greatly exceeded the Alaska division's requirements. Thus we have an established construction of the Act by the Board which should be given weight. Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 513, 69 S.Ct. 1251, 93 L.Ed. 1499, 1509; United States v. Amer. Trucking Ass'ns, 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345, 1354.

We agree with those pronouncements of the Board. We think they correctly indicate the duty of the Board in fixing "fair and reasonable rates of compensation" under § 406(b) in each case to "take into consideration, among other factors * * * all other revenue of the air carrier".

Attention is called to our decision in Summerfield, Postmaster General v. Civil Aeronautics Board, 92 U.S.App.D.C. 248, 207 F.2d 200. There, in an opinion by Judge Prettyman, we hold that profits derived by Western Airlines, Inc., from sale of an air route certificate with operating equipment cannot be excluded from revenue for the purpose of providing an industry incentive. We see no essential difference between that case and this.

The order of the Board of October 18, 1951, fixing mail pay for Chicago and Southern Airlines' Latin American operations is set aside and the case remanded with directions to determine and fix the rate in accordance with this opinion.

Reversed.

BAZELON, Circuit Judge (concurring).

I add this comment to describe another difficulty stemming from the statutory inadequacies which are discussed in my concurrence this day in Summerfield v. Civil Aeronautics Board, 92 U.S.App.D.C. 248, 207 F.2d 200, and Western Air Lines v. Civil Aeronautics Board, 92 U.S.App. D.C. 248, 207 F.2d 200.

The Board refused to offset Chicago and Southern Air Lines' $650,000 excess over anticipated domestic earnings in establishing the mail rate for international operations. It concluded that such refusal would further managerial incentive to low cost operation and high revenue production in the domestic division. This may well be a highly desirable economic objective. But the premise essential to the Board's conclusion is that the domestic excess is directly related to these factors. Neither the Board nor the courts on review can say whether that premise is valid. The statute does not separate need or subsidy payments from compensation for services. Hence it cannot be determined whether all or any part of this domestic excess is attributable to managerial efficiency reflected by low cost operation and high revenue production or to exorbitant subsidy payments included in Chicago and Southern's domestic mail rate. We cannot impute to Congress an intent that the Board should chart its course without such essential information.

PRETTYMAN, Circuit Judge (dissenting).

The court holds that in fixing mail pay for transportation in foreign commerce the Board must include as "other revenue" so-called "excess" earnings on domestic operations and must include that figure in its computation of the carrier's need. The court says that failure "to make the offset" is at variance with the plain meaning of the statute.

The court also expresses its understanding that the omission by the Board of the domestic profits from the calculation was for the purpose of establishing a new incentive policy. So the court finds no essential difference between this case and Summerfield v. Civil Aeronautics Board, 92 U.S.App.D.C. 248, 207 F.2d 200, and Western Air Lines v. Civil Aeronautics Board, 92 U.S.App.D.C. 248, 207 F.2d 200, decided today. I agree that the statute does not authorize the Board to make the omission for the purpose of establishing an industry incentive. My reasons for that view are set out in detail in the opinion in the cases mentioned. But I do not find that problem in the

present case. To be sure, the same phrase of the statute—"all other revenue"—is involved in all three cases. But in the present case the problem is the extent to which the classification of rates authorized by the statute goes. When the statute authorizes one rate for foreign carriage and another rate for domestic carriage, does that cleavage go all through the accounts, so that "all other revenue" in the computation of a foreign rate really means all other revenue from the foreign operation? That problem was not in the other cases.

In its tentative findings in the case at bar the Board held that, without passing on any question of its power, it would as a matter of economic policy omit the domestic earnings from the foreign rate calculation. The Postmaster General challenged that action, maintaining that the statute (the "all other revenue" language in Section 406(b)) required the Board to offset the excess domestic earnings against the need resulting from foreign operations in establishing the foreign rates. In its final opinion the Board held the statute did not so require. But the Board seems not to have rested that conclusion upon a premise that these earnings were not "other revenue" which it must take into consideration, but upon the premise that having taken them into consideration it could for economic reasons omit them from the calculation of the need in the foreign business. The Board then affirmed its former position that it would omit those earnings as a matter of economic policy. It recited several economic reasons why the domestic rates and the foreign rates should be determined separately; for example, that the more robust segment of the industry ought not to be burdened with the obligations of the economically weaker part; and, again, the desirability of preserving a comparative status of domestic carriers. The Board did not consider or decide whether it had power to include these earnings in the computation. It

went only so far as to decide that it had power not to include them.

As I analyze the case, it falls into these questions: In fixing different rates for different services, must the Board "take into consideration" the sum total of all the revenue of the carrier from all its services? Or, on the contrary, in such a case does the statutory term "all other revenue" mean only revenue directly related to the service for which the rate is being fixed; in other words, must the Board omit unrelated earnings from consideration? If the answer to the first question be "yes"—that is, if the Board must take into consideration the sum total of all the earnings of the carrier from all services—may the Board take such earnings into consideration but nevertheless, having considered them, omit them from the calculation of the separate rate?

The statute provides that the Board may fix different rates for different classes of service. Thus the Board clearly had power to fix different rates for international service and for domestic service. The statute provides that in determining the rate "in each case" the Board shall take into consideration the need of the carrier for compensation sufficient to insure the performance of "such service". Then follows the provision that the Board shall consider the need of the carrier for compensation, "together with all other revenue of the air carrier," to enable the carrier to maintain and continue development.

The Supreme Court held in the T. W. A. case [1] that this is a rate-making process. It seems to me that the statute means that in fixing an international rate the Board should determine the amount needed by the carrier to perform that service and to maintain and continue development of that service. The Board should determine what amount the carrier needs, as payment for its international carriage of mail, to meet its foreign expenses and its allocated federal income taxes and receive a fair return on

I. Transcontinental & Western Air v. Civil Aeronautics Board, 1949, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911.

**212**

its foreign investment. It seems to me that the Board could require the foreign transportation and the domestic transportation to stand each on its own feet, neither to be supported by the other. When Congress gave the Board power to fix different rates for different classes of service, it meant for the Board to make separate calculations for each service and rate.

In this connection it seems to me that the concept of different rates for different services in carrying the mail has a definite bearing upon the meaning of "take into consideration". When the Board is fixing a particular rate it should take into consideration factors related to that rate, and none other. Such is plain sense, a sort of rule of relevancy.

So I reach the conclusion that, when the Board is determining a separate rate for a certain type of mail service, the "all other revenue" which it must "take into consideration" means revenue related to that service for which the rate is being fixed. But, if I am in error in that construction of those statutory terms, I am so convinced of the soundness of a complete separation of this foreign rate from the domestic operation that I would have to agree with the Board that the elastic statutory phrase "take into consideration" is sufficiently flexible to permit the omission of domestic earnings from the foreign calculation, even after such earnings are taken into consideration. It is noteworthy that the statute does not describe need as the remainder after all other revenue is deducted. The statute does not speak of offsets or deductions. The statute is affirmative in its prescription. It speaks of compensation which "together with" all other revenue will enable the carrier, etc. This is language appropriate to a measure of discretion in respect to the particular carrier and to the particular service. It seems to me that the intermingling of foreign and domestic factors in the computation of each separate rate would lead to great confusion and to inaccuracy in the supposedly separate results.

The Board said that the fact that the carrier had earned in its domestic operation $654,000 more than had been anticipated created another problem, namely the problem whether the domestic rates had been fixed at too high a level. It directed its staff to begin an investigation of those rates. I think that was correct.

I would affirm the order.