**TRANSCONTINENTAL & WESTERN AIR, Inc. v. CIVIL AERONAUTICS BOARD.**

**No. 9763.**

United States Court of Appeals
District of Columbia.
Argued June 16, 1948.
Decided Aug. 2, 1948.

Mr. Gerald B. Brophy, of New York City, for petitioner.

Mr. Hardy K. Maclay, Assistant General Counsel, Civil Aeronautics Board, of Washington, D. C., with whom Mr. Edward J. Hickey, Jr., Special Assistant to the Attorney General, Mr. Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, Mr. William C. Burt, Chief, Rates Section, Civil Aeronautics Board, Messrs. Louis P. Sissman and Warren L. Sharfman, Attorneys, Civil Aeronautics Board, Mr. George Morris Fay, United States Attorney, and Mr. Oliver Carter, Acting Chief, Enforcement and Litigation Section, Civil Aeronautics Board, all of Washington, D. C., were on the brief, for respondent.

Before EDGERTON and PRETTYMAN, Associate Justices, and KEECH, District Judge, sitting by designation.

PRETTYMAN, Associate Justice.

This case is before us upon a petition to review an order of the Civil Aeronautics

Board which denied petitioner's request that the Board fix a domestic rate for its carrying of the mail for the period January 1, 1946, to March 14, 1947.

By an order dated October 26, 1945, the Board had fixed such a rate for petitioner.[1] The show cause order in that proceeding had been issued January 1, 1945, and the ensuing rate order was made effective as of that date. No motion was made for the reconsideration of that rate order, and no appeal from it was taken.

Petitioner says that it lost money in every month after October, 1945, except June, 1946, in part because of common post-war development, rising costs and declining mail revenues, and in part because of conditions peculiar to petitioner, these latter being principally the grounding of its four-engine Constellations by the Administrator of Civil Aeronautics and a strike of its pilots. Therefore, on March 14, 1947, it filed with the Board the petition which is the premise of the present proceeding. It requested a redetermination of its rates, beginning January 1, 1946. The Board dismissed that petition so far as it requested the fixing of a rate for the period prior to March 14, 1947.

The Board held that it had no power to increase mail rates retroactively to a period in which a final rate order previously entered by the Board was in effect and unchallenged. Its order of dismissal was upon that basis. Commissioner Lee dissented. TWA now presents five points, but all are directed to the question of power. Both parties have briefed and argued extensively that question and that alone.

■ Upon first impression, it would appear that the Board's order would be valid even if it had power to select an earlier date, since it admittedly had discretion to select March 14, 1947, as the effective date. If that were an accurate impression of the whole case, the question of the Board's power to do something it did not do would

be immaterial. But we think we must determine the question, because TWA said to the Board, and says to us, that its rates for the period January 1, 1946, to March 14, 1947, were less than fair and reasonable, and that the order of the Board refusing to consider those rates was arbitrary, capricious and a denial of due process. The Board says it had no power to do otherwise. If it had the power to consider that period, its denial of the petition would have to be premised on something more substantial than mere refusal. It is true that even if we disagreed with the Board on that proposition, its order would not necessarily be invalid, because there would remain the exercise by the Board of the discretion, plainly conferred upon it by the statute, to choose an effective date for its rate orders. But that situation would seem to bring into operation those provisions of the statute which contemplate that under such circumstances we would reverse in a technical sense but remand for further consideration by the Board.[2] So we proceed to consider the question presented and argued.

We agree with the position of the Board. The conclusion depends upon the meaning of that portion of the statute[3] which provides that the Board is empowered and directed to fix fair and reasonable rates of compensation for the transportation of mail by aircraft "and to make such rates effective from such date as it shall determine to be proper".

■ In the first place, we are met with the almost conclusive presumption against power to take retroactive action unless Congress plainly specifies such power.[4] TWA says that the above-quoted provision of the statute supplies the requisite plain specification. But we think that that clause was inserted for the purpose of resolving a controversy concerning the power of the Board to make its rate orders effective as of the date when the proceed-

---

[1] Transcontinental & Western Air, Inc., Mail Rates, 6 C.A.B. 595.

[2] The language of the statute is "* * * and if need be, to order further proceedings by the Board." Sec. 1006(d) of the Act, 52 Stat. 1024 (1938), 49 U.S. C.A. § 646(d).

[3] Sec. 406(a) of the Act, 52 Stat. 998 (1938), 49 U.S.C.A. § 486(a).

[4] Neild v. District of Columbia, 1940, 71 App.D.C. 306, 314 et seq., 110 F.2d 246, 254 et seq., particularly the authorities cited in notes 35–39.

ing began. The same controversy had existed in respect to railway mail pay and had been settled by the Supreme Court.[5] Under the Air Mail Act of 1934, as amended in 1935,[6] the Interstate Commerce Commission made its orders effective as of the date of the initiation of the proceedings, but there was sharp difference of opinion among members of the Commission as to the validity of that action.[7] The dissenting Commissioners were of the view that the New York Centra! case[8] rested upon the statutory provisior compelling railroads to carry the mail, whereas the air mail statute contained no such compulsion. They thought that the absence of that compulsion removed the sole basis for the Court's upholding of retroactive effectiveness.

We need not repeat the long quotations from Congressional hearings, reports and debate relative to the legislative history o: the Air Mail Act of 1938, presented to us by the parties.[9] Suffice it to say that the addition to the original bills of the "make effective" clause appears to have been designed to establish in the Board the same powers which had theretofore existed at the Interstate Commerce Commission in respect to railway mail.[10] And it had been established that the Interstate Commerce Commission could make its orders effective as of the date of the beginning of the proceedings; but it had never been claimed that the Interstate Commerce Commission had unfettered retroactive power.

■ The language of the disputed clause is not necessarily retroactive. It is as apt in reference to the future as it is to the past. A reading of the whole paragraph in which it appears as a clause, makes this clear. In this posture of affairs we must give great weight to the presumption against retroactivity and to the limited legislative purpose apparent from the history.

■ But quite apart from the inferences and presumptions just discussed, two major considerations lead us to our conclusion. The first is the clear nature of the scheme of the statute. There are at least two, and perhaps more, different schemes or plans possible in a system of payment for service such as this. The first is where a price per unit is fixed. In such an arrangement, the fixing of the price is customarily in advance; the contractor makes or loses as his economic skill permits, and he bears the risks of the operation. This is the method ordinarily employed by authorities in regulating the charges of public utilities. The word ordinarily used is "rates". The second general type, or plan, is where a net result of the operation, or of a unit thereof, is contemplated and provided for. In such an arrangement, advance payments may be made to the contractor but the final figure cannot be determined until the operation, or the controlling unit thereof, is complete; the net to the contractor is the same no matter what the quality of the performance may be, and he bears none of the risks of the operation. The so-called "cost-plus" contracts fall within this classification.

We think that the scheme of the statute before us is of the former kind. The statute[11] directs the Board to fix "fair and reasonable rates of compensation for the transportation of mail by aircraft," to pre-

5 United States v. New York Cent. R. Co., 1929, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619.

6 48 Stat. 933, as amended, 49 Stat. 614.

7 Air Mail Compensation, 216 I. C. C. 166 (1936) (dissenting opinion at 191); Air Mail Compensation, 222 I. C. C. 602 (1937) (dissenting opinions at 610).

8 Supra note 5.

9 Hearings before Subcommittee of Senate Interstate Commerce Committee on S. 2 and S. 1760, 75th Cong., 1st Sess. 179, 180, 239, 291, 343, 483-85, 523, 525; H. R. Rep. No. 911, 75th Cong., 1st Sess. 18; Sen. Rep. No. 686, 75th Cong., 1st

Sess.; Hearings before House Committee on Interstate and Foreign Commerce on H. R. 9738, 75th Cong., 3d Sess.; Hearings before Subcommittee of Senate Committee on Interstate Commerce on S. 3659, 75th Cong., 3d Sess.; H. R. Rep. No. 2254, 75th Cong., 3d Sess.; 81 Cong. Rec. 8839, 8882, 9202, 9204; 83 Cong. Rec. 6725.

10 For a general history of the development, see "Federal Regulation of Aviation" by Ballard, 60 Harv.L.Rev. 1235 (1947); particularly on Mail Compensation, id. at 1261.

11 Sec. 406 of the Act, 52 Stat. 998, 49 U.S.C.A. § 486.

scribe the method ("aircraft-mile, pound-mile, weight, space, or any combination thereof") for ascertaining such rates for each carrier; and it requires the Postmaster General to pay "the rates so fixed and determined". The statute further provides that the Board shall take into consideration, "among other factors," the required facilities and service, the character and quality of such service, "and the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

We think that anyone reading the whole of the statutory provisions relative to these rates [12] must conclude that they specify the fixing of a rate, or rates, for the carrying of a physical unit of mail, and that they contemplate future operation. There is no reference to an offset against past losses or to a diminution of past profits. The whole is cast in the form of the usual public utility rate-determination measure. Such measures are frequently made effective as of the date of the inauguration of the proceedings, but never, so far as we know, for periods prior thereto.

It is argued that the consideration of the "need" of the carrier for adequate revenue, required by the last-above-quoted provision of the statute, is necessarily retroactive in operation. We do not think so. Anticipated need is as clearly meant as is demonstrated inadequacy. The provision is not different in principle from the need for sufficient revenue to insure financial stability, which is the rule applicable to public utilities generally [13] and which certainly contemplates the future and not the past.

We cannot find in this statute any language which indicates that Congress intended to guarantee to every carrier a profit.

The second major proposition which impels our conclusion is the result which would ensue if the statute were given unlimited retroactive effect. If the Board could redetermine rates for a past period when the carrier has made less than an adequate profit, or no profit at all, it could do so when the carrier has made more than an adequate profit. The statute makes no differentiation. The financial confusion which would follow from the latter conclusion seems obvious. No rate order would be final. No dividend declaration would be secure. No large commitment would be conclusively feasible. No offering of securities would have a firm foundation. We find no indication that Congress meant to create so great uncertainty. We would not read a statute as yielding such results unless the language was clear and certain. We think that if Congress had intended to provide for recoupment of past losses, it would necessarily have spelled out the terms of the proposal and not have left it to a clause which, if interpreted with that effect, would also have so obviously disastrous effects.

The Board urges long administrative interpretation in support of its position, but our examination of its references in that respect shows that they dealt with policy and not with power.[14] The Board asserted its policy "Aside from the question of whether it has the statutory power to review a rate prior to the date of the institution of the proceeding * * *."[15] Thus,

[12] Supra note 11.

[13] Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

[14] Continental A. L., Mail Rates—Routes Nos. 29 and 43, 2 C.A.B. 683 (1941); Continental A. L., Mail Rates—Routes 29 and 43, 3 C.A.B. 395 (1942); Mid-Continent Air., Mail Rates—Routes Nos. 26 and 48, 3 C.A.B. 464, 466 (1942); Braniff Air., Mail Rates—Routes 9, 15 and 50, 3 C.A.B. 633, 635–37 (1942); Transcontinental & W. A., Mail Rates, 4 C.A.B. 139, 143 (1943); All American Aviation, Mail Rate—Route No. 49, 4 C.A.B. 354, 357 (1943); Pan American Airways, Inc., Alaska Mail Rates, 4 C.A.B. 61, 69 (1944); Caribbean-Atlantic Air., Mail Rate, 7 C.A.B. 943, 946 (1947).

[15] Continental A. L., Mail Rates—Routes 29 and 43, 3 C.A.B. 395, 401 (1942).

it has never gone back of the inauguration of the proceeding, but, until this case, it has never asserted its lack of power to do so. TWA, on the other hand, urges what it considers examples of retroactive application of Board orders. But we do not find those instances indicative of the retroactivity which is necessary to support its position here. TWA also urges the implications from the Board's failure, over the years, to say it had no retroactive power. We think that the administrative history of this statute has no material bearing one way or the other upon the question of statutory power. Our conclusion, as we have said, rests upon the two major propositions which we have discussed.

The order of the Board is affirmed.