TRANSCONTINENTAL & WESTERN AIR, INC. *v.*
CIVIL AERONAUTICS BOARD.

No. 387.   Argued February 8–9, 1949.—Decided April 18, 1949.

*Gerald B. Brophy* argued the cause for petitioner. With him on the brief were *Charles Pickett* and *Joseph S. Iseman.*

*Emory T. Nunneley, Jr.* argued the cause for respondent.   With him on the brief were *Solicitor General Perlman, Stanley M. Silverberg* and *Warren L. Sharfman.*

*Charles H. Murchison* filed a brief for Capital Airlines, Inc., as *amicus curiae,* urging reversal.

Mr. Justice Douglas delivered the opinion of the Court.

The question in this case is whether the Civil Aeronautics Board has authority to fix a new mail rate for air carriers and to make it retroactive for a period in which a final rate previously fixed by the Board was in effect and unchallenged by the initiation of a mail rate proceeding. The answer turns primarily on the meaning of § 406 (a) of the Civil Aeronautics Act of 1938 as amended, 52 Stat. 998, 49 U. S. C. § 486 (a), which empowers the Board to fix and determine the fair and reasonable rates of compensation for the transportation of mail by aircraft and "to make such rates effective from such date as it shall determine to be proper . . . ."[1]

---

[1] Section 406 provides:

"(a) The Authority is empowered and directed, upon its own initiative or upon petition of the Postmaster General or an air carrier, (1) to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft, the facilities used and useful therefor, and the services connected therewith (including the transportation of mail by an air carrier by other means than aircraft whenever such transportation is incidental to the transportation of mail by aircraft or is made necessary by conditions of emergency arising from aircraft operation), by each holder of a certificate authorizing the transportation of mail by aircraft, and to make such rates effective from such date as it shall determine to be proper; (2) to prescribe the method or methods, by aircraft-mile, pound-mile, weight, space, or any combination thereof, or otherwise, for ascertaining such rates of compensation for each air carrier or class of air carriers; and (3) to publish the same; and the rates so fixed and determined shall be paid by the Postmaster General from appropriations for the transportation of mail by aircraft.

"(b) In fixing and determining fair and reasonable rates of compensation under this section, the Authority, considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different

The Board in an order dated October 26, 1945, fixed a mail rate of 45 cents per mail ton-mile for petitioner.[2] From that date until March 14, 1947, petitioner was paid at that rate for its air carrier services. During that time no action was taken by petitioner or by the government to initiate a change in that rate. On March 14, 1947, petitioner filed a petition with the Board alleging that its mail rate had not been fair and reasonable since January 1, 1946, and requesting the Board to fix a fair and reasonable rate "from and after January 1, 1946." After hearing, the Board by a divided vote ruled that it had no authority to fix a mail rate for a period prior to March 14, 1947, and dismissed the petition insofar as it sought that relief. 8 C. A. B. 685. The Court of Appeals affirmed the order of the Board. 83 U. S. App. D. C. 358, 169 F. 2d 893. The case is here on a petition for a writ of certiorari which we granted because of the importance of the question to the carriers and public alike.

air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the Authority shall take into consideration, among other factors, the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transportation of mail; such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

The Civil Aeronautics Board took the place of the Authority on June 30, 1940. See 54 Stat. 1235.

[2] See 6 C. A. B. 595.

The language of § 406 (a), which empowers the Board to "fix and determine" after notice and hearing "the fair and reasonable rates of compensation" for the transportation of mail by aircraft,[3] reads like a typical public utility rate-making authority. Both subdivisions (a) and (b) of § 406, to be sure, reflect some characteristics of rate-making which are peculiar to air carriers. That is true of the methods specified in § 406 (a) for ascertaining the rates of compensation—"aircraft-mile, pound-mile, weight, space, or any combination thereof, or otherwise . . . ." Special standards for rate-making are also prescribed. The Board is authorized to consider "the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers" in fixing different rates for different air carriers or classes of air carriers and different classes of service. § 406 (b). And the Board in determining the rate is authorized and directed to consider "the need of each such air carrier for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense." § 406 (b).

Considerable reliance is placed on this last provision for the view that the Board has authority under the "make effective" clause to order such retroactive adjustments of rates as the "need" of the air carrier makes appropriate. But such a standard has its counterparts in other legislation dealing with rate-making [4] and does not necessarily

---

[3] See note 1, *supra*.

[4] See § 1 of Title I of the Transportation Act of 1940, 54 Stat. 899, 49 U. S. C., note prior to § 1: "It is hereby declared to be the

mark a departure from the customary pattern of fixing rates prospectively. Yet, unless we found a congressional purpose to make a radical break with tradition, we would be most reluctant to give the "make effective" clause the broad meaning which petitioner urges. For the rates of carriers and other utilities fixed by public authorities, while usually prospective, are sometimes made retroactive to the date of the commencement of the rate-making proceeding. See *United States* v. *New York Central R. Co.*, 279 U. S. 73. But, so far as we are aware, they have never been retroactive to an earlier date.

The language of the Act does not suggest that Congress intended to break with these traditions of rate-making.[5] Moreover, the legislative history indicates that the "make effective" clause was inserted only to make clear that the rates could be made retroactive to the date of the application.[6] Finally the scheme of the Act

---

national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act . . . to . . . foster sound economic conditions in transportation and among the several carriers; . . . all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

[5] The other rate-making provisions of the Act likewise follow the conventional pattern. See § 1002 (d) and (e).

[6] The Interstate Commerce Commission in its administration of the Air Mail Act of 1934 as amended, 48 Stat. 933, 935, 49 Stat. 614, 616, had asserted the power to make its orders effective as of the date of initiation of the proceeding. But there was a sharp divergence of views within the Commission over its authority to do so. See *Air Mail Compensation*, 216 I. C. C. 166, 222 I. C. C. 602. The congressional committees seemed primarily concerned with that problem in their consideration of the "make effective" clause

and its underlying policy seem to us to preclude the more expansive reading of the clause urged on us by petitioner.

Petitioner's reading of the Act would in practical effect have the tendency to transform it into a cost-plus system of regulation, a construction which would not harmonize with the apparent design of the Act. Thus § 406 (b) authorizes the Board to fix rates for "classes of air carriers." [7] It is plain that the uniform rate for the class is an important regulatory device. For § 2 (d) of the Act looks to the sound development of an air transportation system through competition.[8] A uniform rate forces carriers within a given class to compete in secur-

in the bills which preceded the ones resulting in the Act. See Senate Hearings, Committee on Interstate Commerce, on S. 2 and S. 1760, 75th Cong., 1st Sess. 179, 180, 239, 291, 343, 483–485, 523. And see H. R. Hearings, Committee on Interstate and Foreign Commerce, on H. R. 5234 and H. R. 4652, 75th Cong., 1st Sess. 325–327. The policy of adhering to conventional rate-making is suggested by H. R. Rep. No. 911, 75th Cong., 1st Sess. 18, and by the statements of Senator Truman who was in charge of the bill in the Senate. 81 Cong. Rec. 9202, 9203, 9204.

This history is relevant to our problem, for though it relates to the 1937 bill which was not passed, the "make effective" clause crystallized at that time and appeared in the 1938 bill which was enacted. The Conference Report on the latter bill is silent on the "make effective" clause, though the following passage from it, H. R. Rep. No. 2635, 75th Cong., 3d Sess. 71–72, by its brief exposition of the power conferred suggests that Congress did not depart from the conventional pattern of rate-making when it enacted the measure:

"This section [§ 406] empowers the Authority to fix mail rates and sets forth the congressional policy to guide the Authority in fixing such rates and enables the Authority to adjust rates so that the policy of Congress may be properly carried out in the case of each carrier or class of carriers according to the needs of the particular case."

[7] § 406 (b) *supra,* note 1.

[8] Section 2 provides:

"In the exercise and performance of its powers and duties under this Act, the [Board] shall consider the following, among other

ing revenue and in reducing or controlling costs. If the Board had authority on the basis of the carrier's needs to make rates retroactive to any point of time, there would be a powerful incentive to seek relief from the uniform rate, not to live within it.

In sum a construction which would make it possible to revise rates retroactively to any point of time would be a real innovation which should have a more solid basis than our own predilections. We cannot but feel that if the rate-making power were to be put to such a novel use, the purpose would have been made clear. It is too unprecedented a departure from the conventions of rate-making to rest on mere inference.

It is pointed out that the Board apparently considers past operating losses in fixing rates[9] and that therefore it is a matter of no great consequence if the rates are

---

things, as being in the public interest, and in accordance with the public convenience and necessity—

. . . . .

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense . . . ."

[9] After the present case was argued in this Court, the Civil Aeronautics Board, on February 21, 1949, awarded a temporary mail rate increase to TWA effective March 14, 1947, to compensate it for losses sustained prior thereto as the result of grounding the Constellation aircraft. *American Airlines, Inc., et al., Mail Rate Increases*, C. A. B. Docket No. 2849, Serial No. E–2484 (Feb. 21, 1949). That action does not render the present case moot, for the new temporary mail rate covers only a part of the losses on the basis of which a rate increase was sought here. Nor do we have in this case any question concerning the power of the Board over temporary, as distinguished from final, mail rates. See *Essair, Inc., Temporary Mail Rate*, 6 C. A. B. 687, 690–691; *In the Matter of National Airlines, Inc.*, C. A. B. Docket No. 3037, Serial No. E–1271, March 5, 1948.

made retroactive to one date rather than another. But the power to fix rates to recoup past losses is a distinct question not before us.

*Affirmed.*

MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, dissenting.

The Civil Aeronautics Board asks us to hold that it is denied by its organic Act any power retroactively to fix rates for carrying air mail. It has not convinced me that it has no *power*, whatever it should wisely do with it as matter of policy.

The fundamental premise of the Court's opinion is that the function of the Board in fixing the air-mail rate is analogous to rate-making for a railroad or a public utility. The two types of rates are not comparable. "Rate" as applied to the Government's air-mail payments is an euphemism to embrace a subsidy as well as compensation. The statute requires the Board, in fixing the "rate" for transportation of mail, to take into consideration the "need of each such air carrier for compensation . . . to insure the performance of such service, . . . and to enable such air carrier . . . to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense." § 406 (b). These considerations are inappropriate in applying ordinary utility rate-making principles. Moreover, utility rates apply to a multitude of customers; the air-mail rate is paid by only one—the Government. Utility services must be paid for currently; air-mail payments can be and are being paid in lump sums on account of items long past.

Congress, in the Act before us, set up a scheme for dealing with each according to its separate nature. The rate for public carriage of passengers and goods by air lines, of course, cannot be fixed retroactively on the basis of experience, for the public must know at the time they take service what they are to pay for it and the carrier must collect then or never. The Act recognizes this necessity with respect to passengers and cargo. Rates for transporting them are required by § 403 to be embodied in filed and published tariffs, which may be altered only after hearing and notice and only prospectively. Section 1002 provides that the Board may institute proceedings to modify these rates and may, after prescribed procedures, set the rates *thereafter* to be charged. Thus, when Congress was dealing with utility rates for passengers and shippers, it permitted only prospective changes, and said so.

But Congress believed that, in the interest of the national defense and commercial aviation, it had to subsidize pioneering air lines and underwrite revenues above those to be realized from passenger and cargo carriage. A feasible way to do it was through air-mail payments. Its plan to that effect was detailed in § 406. But as to this subsidy rate, it enacted no prohibition against retroactivity and, if it had, it is difficult to see how the Board would have authority to go back even to the date of the petition. On the contrary, however, § 406 (a) empowers and directs the Board to determine the air-mail rate and "to make such rates effective from such date as it shall determine to be proper." I see no justification for holding that this language means anything less than just what it says, or for holding that two such opposite kinds of payments must be governed by identical rules.

The Civil Aeronautics Board, however, asks us to hold that the same rules as to retrospective rates are "appli-

cable equally to mail, passenger and property rates under the Act." It urges that its provisions do not "convert the Board's primary function of fixing rates of compensation for the future into a duty to award amounts of compensation for the past" and that, if it sets too low a rate, "the carrier has no redress save a new hearing and the fixing of a more adequate rate for the future." It contends for application of decisions by which this Court "has refused to require the capitalization of past losses in the rate base for the purpose of fixing future rates" or to allow "current reimbursement out of new rates of deficiencies arising from a failure to earn a reasonable return in past years, or the capitalization of costs of maintaining excess capacity during the early period of operation." And the Board argued that it has adhered to such rules and advances policy reasons why we should hold that it is without power to do otherwise.

I have not been able to reconcile the position which the Board took before this Court at its argument on February 8 and 9 with what appears to be its almost contemporaneous action. On February 21, 1949, the Board handed down an order in which it allowed to this very petitioner, in a lump sum, $2,748,000 for the period July 14, 1947, to December 31, 1948, and $33,333 in a lump sum each month thereafter. It said, "The above payments for each of these carriers are in addition to, and not inclusive of, the mail rates provided for in previous *temporary or final mail rate orders,* for the respective periods stated." (Emphasis supplied.) The TWA lump sum of $2,748,000 was to make them whole for the year 1948 and also to pay their "grounding losses" for *1946,* a year prior to the filing of its petition, which the Board asks us to hold as the limit of backward operation of rates. The Board said:

"In 1946, TWA incurred substantial costs because of the grounding of the Constellation aircraft. Sim-

ilar costs were incurred by United and American in 1947 and 1948 when the DC–6 was grounded. These costs are merely another form of developmental costs attributable to the introduction of a new aircraft type. It is clear that they are, in these cases, of such magnitude as to impose a financial burden upon the carriers of such severity as to obstruct their current development. Under our statutory mandate to develop air transportation we should underwrite such costs in some appropriate manner."

At the same time the Board issued a statement of policy. As to the grounding costs which the Board had argued to this Court it had no power to reimburse retroactively, it said that it had originally felt they would not be high enough to require special mail-pay allowance for their "reimbursement." But it continued: "Experience has not supported this view" and it is "desirable to make special mail-rate provision for *established losses of this character.*" It announced that this petitioner, among others, is being paid for grounding losses. "In addition, in view of its obligations under Section 406(b) of the Act, discussed above, the Board has concluded that the temporary mail rates for United and TWA should be increased to an extent sufficient to meet the remainder of their approximate breakeven needs for the year 1948. With respect to the *entire retroactive period* and the future, the Board will determine final rates after formal proceedings which will give consideration to the full reasonable requirements of these two carriers." (Emphasis supplied.)

What I get from the Board's orders and statements is that it is acting in a spirit completely contrary to its argument to this Court and to this Court's opinion, even if there may be a technical consistency, which I doubt. It appears to have authorized capitalization of losses for periods before any rate petition was filed and the amorti-

zation of those losses from subsidy payments afterward. I find far less statutory authorization for such a device for carrying losses forward into current rates than for forthright fixing of effective rates from such prior date as shall be proper. If the need for retroactivity is so imperative that it must be met by evasion, the policy arguments of the Board against construing the statute to permit retroactivity fail. I do not know that these matters of policy should influence the Court in any event, but if they do, my own predilections, unlike the Court's, favor fixing the subsidy on experience rather than on prophecy. In the light of what appears to be the practice, I see no reason why the statute should not be applied so as to carry out what its language conveys and why the subsidy rates should not be regarded as always tentative and subject to revision either to meet unforeseen contingencies or to recapture excessive payments. The Commission would no more be bound to reimburse extravagant management or improvident outlay after it has occurred than to allow for it in advance. In fact, excessive expense would probably be easier to detect in actual statements of operations than in estimates.

But if I were to consider accepting the Board's argument, I would at least set this case for reargument and require a candid explanation of what appears to be a material discrepancy between what the Board has led this Court to hold and the premises on which it seems actually to be proceeding.

Mr. Justice Frankfurter joins in this opinion.