**FRONTIER AIRLINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

**No. 79–1552.**

United States Court of Appeals,
Tenth Circuit.

Argued May 8, 1980.

Decided July 28, 1980.

Rehearing Denied Oct. 8, 1980.

---

Charles S. Murphy, Washington, D. C. (Joseph B. Goldman, Lee H. Simowitz, Baker & Hostetler, Washington, D. C., and James E. Hautzinger, Dawson, Nagel, Sherman & Howard, Denver, Colo., with him on the briefs), Washington, D. C., for petitioner.

Thomas L. Ray, Washington, D. C. (Mary M. Schuman, Gen. Counsel, Gary J. Edles, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Civil Aeronautics Board, Washington, D. C., and John R.

Shenefield, Asst. Atty. Gen., Benjamin B. Grossman, Bruce E. Fein, Attys., Dept. of Justice, Washington, D. C., with him on the brief), for respondent.

Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and MARKEY, Judge.*

MARKEY, Chief Judge.

Frontier Airlines, Inc. (Frontier) seeks review of a final order of the Civil Aeronautics Board (Board)[1] refusing to establish an individual subsidy mail rate for Frontier and fixing final subsidy class rates for the period December 2, 1969—June 30, 1971. We set aside the Board's order and remand the proceeding.

*Background*

Frontier is one of a class of local service airlines receiving a subsidy under the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1301 et seq. (1976) (Act) to maintain service to small communities which would otherwise represent loss operations. Between December 2, 1969, and June 30, 1971, Frontier provided service to 71 such communities.

Subsidy awards take the form of orders under Section 406 of the Act, 49 U.S.C. § 1376 (1976), empowering the Board to fix "fair and reasonable rates of compensation for the transportation of mail by aircraft," taking into consideration, inter alia, the "need" of each carrier. Prior to 1961, subsidy rates were fixed on an individual basis for each eligible carrier.

Beginning in 1961, subsidies for local service carriers (including Frontier) were fixed in the form of successive class rates applicable to all local carriers. New class rates were established from time to time to meet changing circumstances. Generally, the carriers accepted the new class rates without formal hearing. However, after the

carriers accepted Class Rate IV–B, effective July 1, 1969,[2] and before it expired, Frontier requested a change. On December 2, 1969, it petitioned to reopen, asserting that its compensation under Class Rate IV–B had become inadequate. Thereafter, between December 2, 1969, and June 30, 1971, Frontier received temporary subsidy pay under Class Rates IV–B and V. On July 1, 1971, Class Rate VI became effective. No local carrier objected to Class Rate VI.

In a September 1, 1971 letter, the Board's Bureau of Economics (Bureau) advised that it was "preparing to process a final subsidy rate for Frontier Airlines for the period December 2, 1969 through June 30, 1971," and that it intended "to process the subsidy rate determination through the informal mail rate conference procedure." The Bureau's letter sought detailed information on Frontier's revenues, expenses, return, and subsidy need. By March, 1975, after extended communications between Frontier and the Bureau, it became apparent that further effort to reach agreement on a subsidy rate would prove fruitless.

On June 25, 1975, the Board invoked its formal hearing process, issuing a notice of prehearing conference. After the conference, Frontier filed extensive documentation on its revenues, expenses, return, and subsidy need. The Bureau presented detailed rebuttal exhibits.

On June 9, 1976, the Bureau announced a "preferred position": that Class Rates IV–B and V were fair and reasonable, regardless of Frontier's individual subsidy need, between December 2, 1969, and June 30, 1971.

On August 29, 1977, the Initial Decision of the Administrative Law Judge (ALJ) rejected the Bureau's "preferred position" and fixed an individual subsidy rate for Frontier yielding some $8.8 million in addi-

---

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. Order 79–4 171, decided April 26, 1979.

2. *Local Service Class Subsidy Rate IV B*, 51 CAB 732 (1969).

tional subsidy.[3] After making detailed findings, the ALJ concluded that "Class Rate IV–B was inadequate for the local service carrier industry in general and for Frontier in particular;" that "Frontier could no longer live within the framework of the class rate because circumstances which affected its operations and subsidy requirements were beyond its control;" and that Frontier "was justified in seeking to leave the Class Rate System and is entitled to subsidy compensation during the open rate period on an individual basis."

In its opinion dated April 26, 1979, the Board said:

> As a result of our disposition of the case, we find it unnecessary to reach the many questions of cost allocation and financial analysis decided by [the ALJ]. We disagree with him on the threshold issue raised by the Bureau, namely, whether the carrier was entitled to withdraw temporarily from the class rate system and receive an individual retrospective determination of subsidy.
>
> We agree with the Bureau that simply permitting carriers to move in and out of the rate class is inherently destructive of the objectives underlying the class rate system. The salient characteristic of a class rate, from the standpoint of carrier efficiency, is its prospective nature. If carriers must remain within the class, there is no alternative but to pare costs in order to maximize profits in good times, and to minimize losses in bad times. Under a prospective ratemaking structure, moreover, carrier management may make decisions free of uncertainty as to the Board's treatment of the associated costs from a subsidy standpoint. These characteristics of class rates bring a modicum of economic rationality into a cost-plus ratemaking system which has few other controls (other than the good faith of carrier management). They derive their strength precisely from the fact that carriers are not free to enter and leave the system as economic self-interest dictates. Otherwise, when times are good, carriers might remain within the class rate structure, while during periods of poor profits and earnings, they would seek individual rate treatments.

The Board accepted the Bureau's "preferred position" that the temporary class rates paid to Frontier should be made final. The Board emphasized its policy favoring the class rate system as an attractive ratemaking alternative because of: (1) procedural simplification in establishing rates, and (2) increased incentives toward carrier efficiency. In general, said the Board, carriers should remain within the class, having thus a strong incentive to "pare costs in order to maximize profits in good times, and to minimize losses in bad times." The Board held that a carrier could not leave the class, and receive an individualized rate, unless "its ultimate survival is in jeopardy."

In its conclusion, the Board justified its decision by observing that "Frontier has often earned return rates significantly in excess of those in comparable industries while it operated within the class rate system. Losses, such as it suffered during the period involved in this proceeding, are merely the balance to a total objective of carrier viability and continued local service development as envisioned by Section 406 of the Act."

### Issue

The sole issue is whether Frontier is entitled to determination of a new subsidy rate, on an individual basis, for the period December 2, 1969–June 30, 1971.

### OPINION

#### "Closed" and "Open" Rates

■ Mail rates are usually set as "future" rates, that is, prospectively on estimated revenue and expenses. See *TWA v. Civil Aeronautics Board*, 336 U.S. 601, 605, 69 S.Ct. 756, 758, 93 L.Ed. 911 (1949); *Delta Air Lines, Inc. v. Civil Aeronautics Board*, 280 F.2d 636, 638 (D.C. Cir.), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 94

---

3. When computational errors and omissions in the Appendices to the Initial Decision are corrected, as stipulated by Frontier and the Bureau, the total is approximately $12.3 million.

(1960). The rate received by a carrier operating under a future rate is "closed" and not subject to later adjustment in light of actual results. *TWA v. Civil Aeronautics Board*, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949). Carriers operating under a closed rate bear the risk of loss and enjoy better earnings if operations are improved in efficiency. Frontier operated under a closed subsidy rate from July 1, 1969, through December 1, 1969 (Class Rate IV–B) and after June 30, 1971 (Class Rate VI).

A closed rate, however, may be "reopened" and adjusted in light of actual results as of the date of reopening. The rate may be reopened under Section 406(a), 49 U.S.C. § 1376(a) (1976),[4] on the carrier's petition or by the Board's order. *Local-Service Class Subsidy Rate Investigation*, 34 CAB 416, 429 (1961). In a number of cases the carrier filed a petition to reopen, and a new rate was determined on actual operating results: *Cordova Airlines, Inc. Subsidy Mail Rates*, 44 CAB 191, 192 (1966); *Central Airlines, Inc., Mail Rates*, 40 CAB 330, 331 (1964); *Hawaiian Airlines, Inc., Mail Rates*, 39 CAB 118, 119 (1963); *Continental Air Lines, Inc., Mail Rates*, 25 CAB 76, 77 (1957).

Following that established Board procedure, Frontier filed its December 2, 1969, petition to reopen. As the Board said, "Frontier has been on an open subsidy rate since December 2, 1969, when it petitioned the Board to establish an increased final rate for its operations." [5] Frontier was also on open status August 1, 1970, through June 30, 1971, because of Board Action. The Board adopted Class Rate V for that

period and Frontier objected. *See Investigation of the Local Service Class Subsidy Rate*, 56 C.A.B. 74 (1971). The Class V rate was never final as to Frontier, and the temporary class rate was necessarily an open rate, adjustable in light of actual results. As the Board said:

We emphasize that this temporary rate proposal is by no means a prejudgment of the issues involved in establishing a final subsidy rate for the carrier. As the result of Frontier's objection and answer in Order 71–3–7, all issues relevant to the determination of Frontier's fair and reasonable rate are open, including the "other revenue" issue, and that rate may be higher or lower than the amount provided by the Class Rate V formula, quite apart from the "other revenue" question. All relevant issues will therefore be considered in the final rate proceeding, and will be decided solely on the basis of the record developed in that proceeding. If for whatever reason the final subsidy rate should be fixed at an amount lower than the temporary rate, Frontier will, of course, be obliged to refund all temporary rate payments in excess of its need as finally determined by the Board.[6]

The record thus establishes that Frontier was on an open subsidy rate from December 2, 1969, through June 30, 1971, and that its rate was closed before and after that period.

### The Statutory Standard

Section 406(b) of the Act, 49 U.S.C. § 1376(b) (1976), sets forth the statutory

---

4. § 1376 Rates for transportation of mail
 (a). Authorization to fix rates
 The Board is empowered and directed, upon its own initiative or upon petition of the Postmaster General or an air carrier, (1) to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft, the facilities used and useful therefor, and the services connected therewith (including the transportation of mail by an air carrier by other means than aircraft whenever such transportation is incidental to the transportation of mail by aircraft or is made necessary by conditions of

emergency arising from aircraft operation), by each holder of a certificate authorizing the transportation of mail by aircraft, and to make such rates effective from such date as it shall determine to be proper; (2) to prescribe the method or methods, by aircraft-mile, pound-mile, weight, space, or any combination thereof, or otherwise, for ascertaining such rates of compensation for each air carrier or class of air carriers; and (3) to publish the same.

5. Order 71 -6· 141, decided June 29, 1971.

6. Id.

standard for awarding subsidy for services that are not economically self-supporting. It reads in pertinent part:

§ 1376 *Rates for transportation of mail*

. . . . .

*(b) Rate making elements*

In fixing and determining fair and reasonable rates of compensation under this section, the Board, considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the Board shall take into consideration, among other factors . . . (3) the need of each such air carrier (other than a supplemental air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the United States Postal Service, and the national defense. In applying clause (3) of this subsection, the Board shall take into consideration any standards and criteria prescribed by the Secretary of Transportation, for determining the character and quality of transportation required for the commerce of the United States and the national defense.

The Board has recognized that:

[T]he "need" provision of section 406(b), which is the source of our authority to provide subsidy, speaks in terms of "the need of *each* such air carrier for compensation" sufficient to enable it to maintain and continue the development of air transportation. But there is no inconsistency between the concept of a class rate and the concept of individual carrier need. A rate can be fixed for a class of carriers and still provide each individual

carrier with an opportunity to earn an amount equal to its own individual "need" under the statute.[7]

The "need" provision entitles a carrier to subsidy for its subsidy-eligible operations in an amount sufficient "to cover the carrier's operating loss incurred under honest, economical, and efficient management and to provide it an opportunity to earn a fair return (after taxes) on the investment used and useful in its air transportation services." Civil Aeronautics Board, Subsidy for United States Certificated Air Carriers 6 (March 1974).

### The Class Rate System

On this appeal, the Board has concentrated on extolling the values of the Class Rate System. Nothing here said, however, disparages or impedes the operation of that System, when it is conducted in accordance with the Act. The Class Rate System does provide procedural simplification and administrative convenience for the Board. The incentive to pare costs, present in the System and lauded by the Board, would appear equally present to a carrier seeking to leave a class, who must show not only its "need" but its "honest, economical, and efficient management" before it can obtain a new, individualized subsidy rate.

However, nothing in the Act authorizes a brink of bankruptcy criterion for leaving a class. Administrative delays (here almost eleven years) would virtually insure a carrier's demise if that criterion were applied. The only legitimate criterion is that of the statute, namely "need." Under the statute, a carrier must be permitted to leave the Class System, and seek an individualized rate, when it can show that the existing or proposed class rate does not adequately take into consideration its "need," and that it is operating under "honest, economical, and efficient management." Otherwise, a carrier could be forced to remain within a particular class rate, while suffering losses for reasons beyond its control and for an extended period, yet be

7. *Local-Service Class Subsidy Rate Investigation*, 34 C.A.B. 416, 433 (1961).

continually obliged by the Board to provide service under its certificate. To entrap the carrier under such circumstances until its "survival is in jeopardy" would read out of Section 406(b) the requirement that the Board fix a rate in consideration of the carrier's "need . . . for compensation . . . sufficient to insure the performance of such service. . . ." Hence the Board erred in effectively keeping Frontier in Class Rates IV–B and V solely because of its failure to show that it was skirting insolvency during the period December 2, 1969—June 30, 1971.

### The Board's Additional Error

■ It is undisputed that Frontier suffered substantial losses during the open rate period, while class rates were in effect and while it provided mandatory service under its certificate. Nor is it asserted that those losses were due to Frontier's ineptitude or inefficiency. On the contrary, the Board said, "Frontier was in the midst of a negative business cycle which, while reflecting overall economic forces, may have been particularly harsh on the local service carriers." The Board proceeded, however, to refuse a change in the rates applicable to Frontier during the open rate period, relying heavily on profits earned by Frontier outside that period. That was reversible error.

That the Board should have confined its inquiry to carrier results during the open rate period, and should not have reached into closed rate periods to justify its decision, is made clear by Section 406 of the Act. Contemplating future operation, Section 406 does not permit the Board to set increased rates during an open rate period in order to offset losses during closed rate periods. *See TWA v. Civil Aeronautics Board,* 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949). As the Board has said, "it is so well-established as to be axiomatic that the Board in establishing mail rates does not make up past inadequacies in earnings." *Reopened Delta—C & S Mail Rate Case,* 28 C.A.B. 820, 836 (1959), and, more recently, "the Board has adhered to the public utility rate regulatory pattern under which losses, incurred by carriers in past years while on closed rates, cannot be made up with subsidy in fixing future rates." Civil Aeronautics Board, Subsidy for United States Certificated Air Carriers 6 (March 1974).

Similarly, profits earned during closed rate periods are not to be diminished by refusing to adjust losses suffered during an open rate period. "To take in profits or make up losses in years prior to the time the rates were challenged would be equally inappropriate." *Transatlantic Final Mail-Rate Case, Reopened,* 23 C.A.B. 307, 323 (1956). *See Chicago and Southern Air Lines, Inc., Mail Rates,* 4 C.A.B. 419, 420–21 (1943). If the Board could revise, or refuse to adjust rates effective during an open rate period, in light of results during closed rate periods, no rate order would be final and financial confusion would result. Under the statutory scheme, the closed rate period is simply not relevant to a determination of a proper subsidy during an open rate period.

We hold that the Board must determine a new subsidy rate that will ensure a fair return for the open period.[8] Accordingly, we set aside the Board's order and remand this proceeding for determination of a new subsidy rate for Frontier, on an individual basis, for the open rate period December 2, 1969–June 30, 1971.

### REVERSED AND REMANDED.

---

8. In view of our holding, it is unnecessary to discuss whether: (1) the class rates imposed by the order are confiscatory; (2) the Board applied Class Rate V to Frontier without "notice and hearing," Section 406(a), without determining "need," Section 406(b), and without adequate findings and substantial evidence that Class Rate V is "fair and reasonable;" (3) the Board was arbitrary and capricious in changing its previous position (that Frontier was entitled to an individual subsidy rate); (4) the Board's treatment of Frontier was inconsistent with its treatment of Texas International Airlines; (5) the Board misapplied 14 C.F.R. 302.303(b).