**AIR NEW ENGLAND, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

**No. 80–1390.**

United States Court of Appeals,
First Circuit.

Argued Nov. 6, 1980.
Decided Feb. 3, 1981.

**826**

Raymond J. Rasenberger, Washington, D. C., with whom Warren L. Sharfman, and Zuckert, Scoutt & Rasenberger, Washington, D. C., were on brief, for petitioner.

Thomas L. Ray, Atty., C.A.B., Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Mary McInnis, General Counsel, Michael Schopf, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert B. Nicholson, and Daniel Conway, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and HOFFMAN,* District Judge.

BOWNES, Circuit Judge.

Petitioner Air New England, Inc. seeks review of the decision of the Respondent Civil Aeronautics Board (CAB) that the Airline Deregulation Act of 1978 did not by operation of law open the existing subsidy rates of subsidized carriers. For the reasons stated below, we affirm the decision of the CAB.

To understand the issue presented, it is first necessary to understand the manner in which subsidies to airlines are granted. "Rate" in this context means the annual subsidy paid to the carrier. The rate is calculated on the basis of the compensation needed by the carrier to ensure the maintenance of its service and to develop air transportation. Theoretically, subsidized carriers operate on "final" (closed) rates. · If a carrier wishes to have its rate changed, it may petition to have its rate "opened" and a new one set. The Board may also on its own initiative open a carrier's rate. Under a doctrine approved by the Supreme Court in *Transcontinental & W. Air, Inc. v. CAB*, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949) (*TWA*), the Board may not give retroactive effect to a rate modification beyond the date on which the rate was opened for review. Between the time the carrier's rate is opened and the time a new final rate is set, the Board generally establishes a "temporary" rate for the carrier. The amounts paid under the temporary rate will be supplemented to the extent that the final rate eventually set is higher than the temporary rate, but must be refunded to the extent that the final rate proves to be lower than the temporary rate granted.

Air New England receives a subsidy under § 406 of the Federal Aviation Act, 49 U.S.C. § 1376, for providing air service to certain New England areas whose traffic generally is too low to support profitable service by certificated air carriers.[1] On March 16, 1979, it filed a petition with the Board to open its rate. The carrier requested a temporary annual subsidy of approximately $4.6 million, as well as an unspecified increase in its final rate. Ten days later Air New England filed an amendment to this petition requesting a final subsidy rate of $5.4 million annually. On April 20, Air New England filed an amendment in-

---

* Of the Eastern District of Virginia, sitting by designation.

1. Air carriers holding certificates authorizing them to transport mail are eligible for "subsidy" mail pay. For approximately the past 25 years, however, § 406 subsidies have been paid only to those smaller carriers largely responsible for providing air service to small communities with light air traffic. Air New England became a subsidized airline in January 1975 when it was awarded a certificate of public convenience and necessity to provide local air service within New England.

creasing the amount of its request for both temporary and final subsidies because of a change in its calculations: the airline computed its need at $5 million annually on a temporary subsidy basis and $5.8 million annually for its final subsidy rate. On May 10, 1979, the Board awarded the carrier a temporary subsidy of $4.6 million from the date of Air New England's original petition, March 16, 1979. This order was made final on May 23, 1979.

Air New England filed a third amendment to its petition on January 24, 1980. It requested an increase in its temporary rate and, for the first time, asked that its subsidy be extended to cover the period from October 24, 1978, the date of the enactment of the Airline Deregulation Act of 1978, to March 16, 1979, the date on which it had petitioned to have its rate opened. In its April 16, 1980 Order to Show Cause, the CAB agreed to a small increase in the carrier's temporary subsidy rate, but found that the Deregulation Act did not require it to open Air New England's subsidy rate back to October 24, 1978, adhering to its decision that the carrier's rate was opened on March 16, 1979. It is this decision that is the subject of Air New England's petition for review.

To prevail, Air New England must overcome the *TWA* rule that the Board may retroactively modify a § 406 subsidy rate only to the date on which the rate was opened.[2] In *TWA* the Court noted that § 406 "reads like a typical public utility rate-making authority." *Id.* at 604, 69 S.Ct. at 757. Customarily such rates are never set retroactively to the commencement of the rate-making proceeding. The Court in *TWA* found that neither the language nor the legislative history of the Act suggested that Congress had intended to depart from these rate-making traditions. *Id.* at 605, 69 S.Ct. at 758. As a result, the Court felt that

> a construction which would make it possible to revise rates retroactively to any point of time would be a real innovation which should have a more solid basis than our own predilections. We cannot but feel that if the rate-making power were to be put to such a novel use, the purpose would have been made clear. It is too unprecedented a departure from the conventions of rate-making to rest on mere inference.

*Id.* at 607, 69 S.Ct. at 759.

Air New England argues that by the passage of the Airline Deregulation Act, Congress has made such a purpose clear. First, it points to the changes made in § 406(b) by the 1978 amendments,[3] summarizing them as follows:

---

**2.** The Court in *TWA* was construing §§ 406(a) and (b) of the Civil Aeronautics Act of 1938. These provisions are virtually identical in all pertinent respects to §§ 406(a) and (b) of the Federal Aviation Act of 1958, which was amended by the Airline Deregulation Act.

**3.** Before its amendment in 1978, § 406(b) provided:

> In fixing and determining fair and reasonable rates of compensation under this section, the Board, considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the Board shall take into consideration, among other factors, (1) the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transporta-

tion of mail; (2) such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and (3) the need of each such air carrier (other than a supplemental air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the United States Postal Service, and the national defense. In applying clause (3) of this subsection, the Board shall take into consideration any standards and criteria prescribed by the Secretary of Transportation, for determining the character and quality of transportation required for the commerce of the United States and the national defense.

1. For the period between October 24, 1978 and January 1, 1983, all other revenue of the air carrier is not to be considered in determining an air carrier's need for compensation. Instead "all other revenue of the air carrier from the service for which the compensation is being paid" must be considered. 49 U.S.C. § 1376(b)(3)(A).

2. The subsidy must be sufficient to enable the carrier "to provide . . . air transportation of at least the same extent, character, and quality as that provided during the year ending December 31, 1977." 49 U.S.C. § 1376(b)(3).

3. "[R]ates of compensation paid to any carrier . . . for service performed between October 24, 1978 and January 1, 1983, shall be based on the subsidy need of such carrier with respect to service performed to points for which such carrier was entitled to receive compensation for serving during calendar year 1977." *Id.*

4. For carriers, other than local service carriers, that received "compensation during the twelve months ended June 30, 1978, . . . subsidy need shall be determined pursuant to the method in effect during the twelve months ended June 30, 1978." *Id.*

---

49 U.S.C. § 1376(b) (1976).

The 1978 amendments deleted certain language from (b)(3) above, including the phrase "together with all other revenue of the air carrier." Section (b)(3) now reads: "the need of each such air carrier (other than a charter air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service[.]"

The amendments also added the following language to (b)(3):

(A) during the period beginning October 24, 1978 and ending on January 1, 1983, both dates inclusive, together with all other revenue of the air carrier from the service for which the compensation is being paid; and

(B) after January 1, 1983, together with all other revenue of the air carrier;

to enable such air carrier under honest, economical, and efficient management, to provide (except for modifications with respect to an individual point determined after January 1, 1983, to be required by the public interest, after giving interested parties an opportunity for an evidentiary hearing with respect to air transportation for such individual point) air transportation of at least the same extent, character, and quality as that provided during the year ending December 31, 1977, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense. Notwithstanding any other provision of this section, rates of compensation paid to any carrier under this section for service performed between October 24, 1978 and January 1, 1983, shall be based on the subsidy need of such carrier with respect to service performed to points for which such carrier was entitled to receive compensation for serving during calendar year 1977. In the case of any local service carrier, such subsidy need shall be based on the adjusted eligible need of such carrier determined in a matter consistent with the provisions of Local Service Class Subsidy Rate VIII, with technical adjustments, and in the case of any other carrier receiving compensation during the twelve months ended June 30, 1978, such subsidy need shall be determined pursuant to the method in effect during the twelve months ended June 30, 1978. Any air carrier receiving compensation from the Board pursuant to this section which, before January 1, 1986, terminates service to a point for which such compensation is paid shall not, if such service is resumed by such air carrier, be eligible for compensation from the Board under this section for such service. Nothing in this subsection shall be construed as prohibiting any air carrier specified in the preceding sentence from applying for and receiving compensation for such service under section 1389 of this title. In applying clause (3) of this subsection, the Board shall take into consideration any standards and criteria prescribed by the Secretary of Transportation, for determining the character and quality of transportation required for the commerce of the United States and the national defense. In determining compensation for any local service air carrier for the years 1964, 1965, and 1966 in accordance with the provisions of this subsection, the Board shall apply Local Service Class Subsidy Rates III and III–A as set forth in Board orders E–21311 and E–23850 (41 CAB 138 et seq. and 44 CAB 637 et seq.), except that the Board shall not apply that part of such order which requires the Board to take into account any decrease in the Federal income tax liability of such carrier for such year resulting from any net operating loss carryback pursuant to section 172 of Title 26.

49 U.S.C. § 1376(b)(3).

Congress added to § 406(c) the proviso that "[t]he Board shall make no payments under this section for any services performed after January 1, 1986." 49 U.S.C. § 1376(c).

In Air New England's view, these changes, and their legislative history, demonstrate Congress' desire to substitute competition for regulation in the air transport industry by moving gradually from regulation to deregulation. This, it argues, places upon the Board an affirmative duty to fix subsidy rates for the entire period between October 24, 1978 and January 1, 1983. According to Air New England, the amendments require the Board to make a de novo determination of whether, on or after October 24, 1978, the subsidy Air New England was receiving satisfied its need, based only upon a consideration of its revenues from the service for which the compensation was being paid. Such a determination, it urges, is also needed if the Board is to decide if the subsidy paid on or after October 24, 1978 was sufficient for Air New England to provide air transportation at least equal to that provided in 1977. According to the carrier, if a rate is opened for one purpose, it is opened for all purposes. By this Air New England appears to be asserting that the rate may be adjusted not only to conform to § 406, but also to reflect the carrier's cost increases. Air New England also maintains that only by sheer happenstance could either the Board or a carrier have begun subsidy rate proceedings precisely on October 24, 1978.

In an effort to further distinguish TWA, the carrier points to the Supreme Court's hesitancy in that case to approve a construction "which would make it possible to revise rates retroactively to *any point of time*," 336 U.S. at 607, 69 S.Ct. at 759 (emphasis added); in the situation presented here, the rate would be retroactive only to October 24, 1978. It also notes that the Court characterized the provision as similar to a "typical public utility rate-making authority." *Id.* at 604, 69 S.Ct. at 757. Petitioner cites various Board declarations for the proposition that as a result of deregula-

tion, air carriers are not public utilities and should not be treated as if they were.

Although ingenious, Air New England's arguments have not persuaded us that Congress had any intention of altering the TWA rule. The interpretation of a statute by the agency charged with its administration deserves considerable respect. *E. g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940); *Frontier Airlines, Inc. v. CAB,* 621 F.2d 369, 372 (10th Cir. 1980). In its Order to Show Cause of April 16, 1980 the Board stated that it did not agree that Congress intended to undercut the TWA doctrine when it adopted the Airline Deregulation Act.

Our reading of the pertinent provisions leads us to agree with the Board. The Supreme Court has held that in interpreting the words of a statute, a court should adopt the usual meaning of those words unless this would lead to "absurd results" or "would thwart the obvious purpose of the statute." *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *accord, United States v. American Trucking Ass'ns, Inc.,* 310 U.S. at 543, 60 S.Ct. at 1063. Clearly the Board's interpretation does not lead to "absurd results". And we refuse to infer Congress' intent from isolated changes in the Act in the absence of any mention in the legislative history of Air New England's theory.[4] *See* H.Conf.Rep.No.1779, 95th Cong., 2d Sess. 70, *reprinted in* [1978] U.S. Code Cong. & Ad.News 3773, 3786–87; H.R. Rep.No.1211, 95th Cong., 2d Sess. 12, *reprinted in* [1978] U.S.Code Cong. & Ad. News 3737, 3748.

The Board persuasively responds to several of the considerations on which Air New England premises its inference of congressional intent. Although not disputing the

---

4. In fact, the Conference Report notes that the House amendment to § 406, which was adopted by the conference, prohibited the Board from considering "all other revenues" in determining subsidy levels for the "first 4 years." The Report's loose reference to the period from October 24, 1978 to January 1, 1983 as "4 years" supports the view that Congress never considered that the adoption of the deregulation statute would automatically open all rates on the date of its passage.

carrier's characterization of the Airline Deregulation Act as an attempt to allow competition to determine the quality and cost of air transportation, the Board notes that this congressional policy does not logically apply to a subsidy program established because market forces alone would not cause carriers to supply the needed service. It also strongly disagrees with Air New England's claim that only by sheer coincidence could either party have begun subsidy rate proceedings on October 24, 1978. It points out that highly publicized congressional hearings on the subject were held in 1977 and 1978 and that the President's intention to sign the bill into law on October 24, 1978 was announced several days in advance. Air New England could reasonably have been expected to know far enough in advance the effective date of the Deregulation Act to open its rate on that date.[5] We see no merit in petitioner's complaint that local carriers on open rates automatically received the benefit of § 406(b) from the date of passage of the Act, while under the Board's interpretation, those on closed rates did not. That is the difference between open rates and closed rates; it was not changed by the Act.

As a separate ground for rejecting Air New England's argument, the Board relied on a "savings clause" in the Deregulation Act that states:

All orders, determinations, rules, regulations, permits, contracts, certificates, rates, and privileges which have been issued, made, or granted, or allowed to become effective, by the President, the Civil Aeronautics Board, or the Postmaster General, or any court of competent jurisdiction, under any provision of law repealed or amended by this Act, or in the exercise of duties, powers, or functions, which are vested in the Board, and which are in effect at the time this Act takes effect shall continue in effect according to their terms until modified, terminated, superseded, set aside, or re-

pealed by the Board, or by any court of competent jurisdiction, or by operation of law.

49 U.S.C. § 1301 note. The Board argues that under this provision, the 1977 order setting the carrier's then-current subsidy rate continued in effect until changed or terminated by the Board, by a court of competent jurisdiction, or by operation of law. It cites the clause as further evidence that Air New England's rate was not opened by the Deregulation Act, because no section of the Act specifically required such an opening. Although the argument is hardly dispositive of this case, we have in essence already rejected the carrier's claim that the rate *was* opened by operation of law. We agree with the Board that the savings clause preserved the subsidy rates in effect for Air New England when the Deregulation Act was passed.

Because the Board's interpretation neither leads to absurd results nor frustrates Congress' intent, we are left to consider only the words of the statute themselves. We find in them no indication that subsidy rates were to be opened automatically with the passage of the Airline Deregulation Act. The amendments affected not the existing subsidy rate, but the Board's authority to set such rates in the future.

The Board in its decision took the position that Congress left nothing to implication in the Deregulation Act when it was devising major changes in the Board's statutory obligations. It cited as a specific example § 419 of the statute, 49 U.S.C. § 1389. Section 419 sets out in great detail a series of determinations that the Board must make as an aid in guaranteeing essential air service to small communities. We agree with the Board that if Congress had also wanted rates opened precisely on October 24, 1978, it would have said so in specific terms in § 406.

We have considered the carrier's other arguments and find them unpersuasive. We hold that Air New England's subsidy

5. The brief for the Board states that other carriers eager to take advantage of other liberalized provisions of the Airline Deregulation Act had representatives waiting in line at the Board's office as early as October 19. Brief for Respondent at 24.

rate was not automatically opened by Congress' passage of the Airline Deregulation Act. We affirm the decision of the Civil Aeronautics Board that Air New England's subsidy rate was opened on the date when it actually petitioned the Board for review.

*Affirmed.*