**TRANS WORLD AIRLINES, INC., Pan American World Airways, Inc., United States Postal Service, Harold Brown, Secretary of Defense, Petitioners,**

**Braniff Airways, Inc., Northwest Airlines, Inc., The Flying Tiger Line, Inc., Intervenors,**

**v.**

**CIVIL AERONAUTICS BOARD, Respondent.**

**Nos. 34–37, Dockets 79–4131–2, 79–4171–2.**

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1980.

Decided Nov. 7, 1980.

Ronald D. Eastman and Stephen C. Trow, Washington, D. C. (Cadwalader, Wickersham & Taft, Washington, D. C., of counsel), for intervenor Northwest Airlines Inc.

Alfred J. Eichenlaub, Washington, D. C. (Ginsburg, Feldman, Weil & Bress, J. W. Rosenthal, Washington, D. C., of counsel), for intervenor The Flying Tiger Line, Inc.

Alan R. Demby, Washington, D. C. (Civil Aeronautics Board, Glen M. Bendixsen, Associate Gen. Counsel, Mary McInnis, Gen. Counsel, Michael Schopf, Deputy Gen. Counsel, of counsel), for respondent.

Edmund E. Harvey, Washington, D. C. (Chadbourne, Parke, Whiteside & Wolff, Washington, D. C., of counsel), for petitioner Trans World Airlines.

Whitney North Seymour, Jr., New York City (Simpson Thacher & Bartlett, New York City, Crowell & Moring, Calvin Davison, Washington, D. C., of counsel), for petitioner Pan American World Airways, Inc.

Mark H. Gallant, Washington, D. C. (U. S. Postal Service, Robert A. Scherr, Asst. Gen. Counsel, Michael J. Vandamm, Henry Bevans, Dept. of the Air Force, Daniel S. Rak, Asst. Gen. Counsel, Richard Anderl, Dept. of Justice, Alice Daniel, Asst. Atty. Gen. Anthony J. Steinmeyer, Burton D. Fretz, Washington, D. C., of counsel), for petitioners U. S. Postal Service and Harold Brown, Secretary of Defense.

M. Jane Snyder, Washington, D. C. (Arnold & Porter, Washington, D. C., of counsel), for intervenor Braniff Airways, Inc.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The Civil Aeronautics Board (CAB) in proceedings captioned Transatlantic, Transpacific and Latin American Service Mail Rates Investigation by orders dated December 21, 1978 (Final Order, Order 78–12–159) and July 3, 1979 (Order on Reconsideration, Order 79–7–17) established rates of compensation for the transportation of air mail by United States air carriers in the Transatlantic, Transpacific and Latin American regions for the period beginning March 8, 1974. Petitioners Trans World Airlines, Inc. (TWA) and Pan American World Airways, Inc. (Pan Am) together with intervenors, Northwest Airlines, Inc. (Northwest) and Braniff Airways, Inc. (Braniff) (hereinafter collectively referred to as the carriers) [1] have submitted a joint brief on consolidated petitions for review of these two orders pursuant to Section 1006 of the Federal Aviation Act (FAA), 49 U.S.C. § 1486. The carriers challenge the CAB orders on two grounds:

(1) That they are violative of Section 4 of the International Air Transportation Fair Competitive Practices Act of 1974 (FCPA), 49 U.S.C. § 1376(h)(3).

(2) That the cost methodology employed by the CAB was arbitrary and capricious and unsupported by substantial evidence.

The Department of Defense (DOD) and the United States Postal Service (Postal Service) have also challenged the same Board orders in a petition to review, filing a joint brief in this proceeding. Primarily

---

1. Seaboard World Airlines, Inc. participated in the proceedings before the CAB but has not petitioned for review or sought to intervene in this court.

they attack the refusal of the CAB to apply its final rates retroactively from the date the proceeding was instituted, March 8, 1974, instead of prospectively from the date of the final order, December 21, 1978. The Government petitioners also urge that the addition of a ten percent factor by the CAB to the all–cargo capacity costs allocated to the combined class of priority mail and military official mail for all–cargo aircraft was not justified by substantial evidence. Intervenor Flying Tiger Line, Inc. (Flying Tiger) contends that this ten percent upward adjustment for all–cargo aircraft was a "well reasoned exercise of agency judgment."

Finally, intervenor Northwest argues that the CAB incorrectly allocated capacity costs on the basis of space rather than a combination of space and weight factors. It also attacks the CAB's application of a cargo load factor adjustment which assigned a greater share of unused aircraft capacity to passenger service than to freight or mail.

For the reasons hereinafter set forth the orders of the CAB challenged by the petitioners are affirmed in all respects.

I

A. Factual Background

The three basic categories of international mail involved in this proceeding are priority mail, MOM and SAM. Priority mail consists of civil and military personal mail bearing air mail postage and official military mail marked for air mail treatment. Since April 1, 1975 air carriers have been required to accept all air mail possible and air mail is afforded priority over all loadings except confirmed passengers. MOM consists primarily of official military mail endorsed "MOM" or "First Class Mail." The boarding priority of MOM is equal to that of commercial air freight, on a first–in, first–out basis. Transportation Handbook, Series T–1, § 642.2. SAM is largely military personal mail to and from Armed Forces post offices located outside the 48 contiguous states which is transported between these offices and destination or origin points within the United States on scheduled United States air carriers on a space available basis in accordance with specific statutory provisions. See 39 U.S.C. § 3401. Since December 13, 1975, the Postal Service has merged the tender of military air mail, MOM and SAM letters, flats and tapes, not exceeding thirteen ounces. This letter mail is transported at the MOM priority and rate level. Also at issue are the rates to be paid for "foreign transit mail," which is mail with foreign origins and destinations which passes through the United States and the hands of the Postal Service, and is placed on a United States air carrier for the rest of its journey. Thus a letter from Peru to Paris may be redispatched in New York on a Paris bound United States air carrier. DOD reimburses the Postal Service for payments to air carriers for the international transportation of military mail.

It is undisputed that foreign air carriers obtain mail from the Postal Service but only as a last resort. Under Postal Service regulations, military airmail is exclusively reserved for United States commercial air carriers to the maximum limit of their capabilities unless it is directed to points they do not serve, Transportation Handbook Series T–1, § 616, and other priority mail can be routed on other foreign flag carriers only with Postal Service approval and only when American service does not exist or is limited. Id. at § 253.3. In the proceedings below it was established that in 1974 the Postal Service paid foreign postal services or foreign carriers a total of only $4.8 million while paying the six United States carriers involved in this litigation some $114 million for transporting United States international air mail. These American carriers also received almost $8.8 million for the carriage of foreign mail.

International mail rates paid to foreign carriers to some extent at least are fixed by the Universal Postal Union (UPU), an agency of the United Nations which has 154 member countries including the United

States.[2] Regardless of the number of foreign carriers receiving UPU rates, the rates are admittedly higher than those received by American carriers under CAB rates. This disparity in part prompted the existing litigation.

### B. The Proceedings Below

By order dated March 8, 1974 (Order 74–3–40) the CAB instituted an investigation to determine the fair and reasonable air mail rates for the transportation of priority mail and MOM in the Transatlantic, Transpacific, and Latin American rate areas established by the CAB. The proceeding was consolidated with an ongoing investigation of the fair and reasonable rates for the transportation of SAM which had been initiated by a Pan Am petition filed on March 8, 1973. Thus the rates for all of the previously described categories of international mail were under consideration.

The rate period for all these classes of mail was to commence on March 8, 1974. In February 1975 the CAB fixed temporary rates which provided increases for the carriers to compensate for fuel price increases as well as other putative cost rises. After due notice public hearings were commenced before the CAB on December 8, 1975 to establish permanent rates. See 49 U.S.C. § 1376(a). The hearings were adjourned on December 9 at the request of the interested parties to allow negotiation of the issues under investigation. In all prior cases such negotiation had been successful but unfor-

tunately in this case no agreement could be reached. Thus for the first time in the CAB's forty year history air mail rates for international transportation would be determined by formal investigation of their reasonableness instead of by agreement.

Hearings resumed on January 6, 1976 before Administrative Law Judge Arthur S. Present and were concluded on January 12, 1976. Later statements of positions and briefs were filed by the parties now involved in this appeal. The Administrative Law Judge made his Initial Decision on March 17, 1977. The CAB sua sponte decided to review the decision on March 30, 1977 (Order 77–3–170). On September 28, 1977 the CAB heard oral argument and then issued its opinion and the order now under review on December 21, 1978. That order was supplemented by its Opinion and Order on Reconsideration of July 3, 1979.

## II

### Governing Statutes

Section 406(a) of the Federal Aviation Act (49 U.S.C. § 1376(a)) empowers the CAB "to fix and determine from time to time, after notice and hearing, the fair and reasonable rates of compensation for the transportation of mail by aircraft ...."[3]

Faced with what it viewed as the discriminatory treatment of United States international air carriers in foreign air transporta-

---

**2.** The UPU, which has been in existence since 1874, conducts its operations through congresses of member countries held every five years. Its primary function is to establish maximum rates for the carriage of foreign origin mail, or mail of one country transported by carriers of another country. However, it does appear from the record that several countries (not including the United States) pay their own carriers at UPU rates for transporting national origin mail.

There is a wide difference among the parties with respect to the percentage of foreign flag mail covered by UPU rates. The Administrative Law Judge found that only a relatively small percentage of mail is paid for at UPU rates. The CAB argues that while a majority of foreign countries still pay UPU rates, the countries not doing so account for the vast majority of total international mail. The joint carriers

argue that seventy percent of the world's international mail carried by foreign carriers moves at UPU rates. As in the case of most statistics there is some data which supports each of the opposing claims. The point is irrelevant, however, since there is no nexus between this finding of the Administrative Law Judge and his and the CAB's holdings that no competitive disadvantage is suffered by American carriers by virtue of their foreign competitors receiving UPU rates. This issue will be discussed *infra*, pt. IV.D.

**3.** Section 406(b)(3), 49 U.S.C. § 1376(b)(3) authorizes the CAB to determine "subsidy" rates for those carriers which are not self–sustaining. See *Trans World Airlines, Inc. v. CAB*, 385 F.2d 648, 653 (D.C.Cir.1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). Subsidy payments are not in issue in this case.

tion, Congress in 1975 amended Section 406 by adding subsections (h)(2) and (3), grouped together as Section 4 of the International Air Transportation Fair Competitive Practices Act of 1974 (FCPA), 49 U.S.C. § 1376(h)(2) & (3). Hereinafter those subsections will be referred to for the sake of simplicity as Section 4, FCPA. The initial version of that section, S. 3481, was introduced in the Senate on May 13, 1974 by Senator Cannon, Chairman of the Senate Commerce Committee, Subcommittee on Aviation. The proposed legislation would have required the CAB to fix international mail rates payable to American air carriers at the UPU rate, which was the rate paid to foreign carriers by the Postal Service.[4] Hearings were held by the Subcommittee in July, 1974. Predictably the CAB and the Postal Service opposed and the carriers favored the proposed legislation. The Commerce Committee reported an amended form of S. 3481 to the Senate on October 9, 1974. As revised Section 4 eliminated the mandatory requirement that UPU rates be paid to American carriers but required that the Secretary of State and the Postmaster General negotiate for UPU rates no higher than the actual costs of transportation of the mail, including a reasonable rate of return on investment. S.Rep.No. 93–1257, 93d Cong., 2d Sess. 13 (1974). The Committee Report indicated that it had rejected mandatory application of UPU rates because they represented an indirect subsidy which many foreign nations had elected to pay regardless of realistic costs, and their adoption for all United States international airlines would result in a windfall for financially healthy American carriers. *Id.* at 7. The bill as amended was passed by the Senate on October 10, 1974 by a 74–2 vote.

The identical version of the initial Senate Bill was introduced into the House on April 11, 1974 (H.R. 14266) by Congressman Staggers, Chairman of the House Committee on Interstate and Foreign Commerce. After hearings the House Committee amended its bill to eliminate mandatory UPU rates. Instead it adopted provisions substantially the same as the amended Senate Bill, but with an additional requirement that in establishing rates the CAB "shall take into consideration" the UPU rates. H.R.Rep.No. 93–1475, 93d Cong., 2d Sess. 1–2 (1974), U.S. Code Cong. & Admin.News 1974, p. 7461. Congressman Murphy dissented, claiming that the amended version had emasculated Section 4 by not mandating payment to United States carriers at the UPU rate as initially proposed. He argued that no subsidy was involved in the UPU rates because they are essentially cost based. *Id.* at 25–28. After debate Congressman Murphy introduced an amendment which again would have required that American carriers receive UPU rates. The amendment carried and the House approved the bill as amended by a vote of 221 to 54. 120 Cong.Rec.H 11898. The Senate Commerce Committee refused to accept the mandatory application of the UPU rates and instead drafted the version of the statute which is now the law. 120 Cong.Rec.S 21807. On December 18, 1974, the House concurred in the Senate version. 120 Cong.Rec.H 12277–78. The President signed the bill on January 3, 1975. Section 4, FCPA now provides:

(2) The Secretary of State and the Postmaster General each shall take all necessary and appropriate actions to assure that the rates paid for the transportation of mail pursuant to the Universal Postal Union Convention shall not be

---

4. The bill provided in pertinent part:

[T]he Board shall not fix and determine for any air carrier a rate of compensation for transporting mail by aircraft between the United States and such foreign country which is lower than the rate of compensation payable by the Postmaster General to or for the account of any such foreign air carrier when such carrier transports such mail between the United States and such foreign country.

*International Air Transportation Fair Competitive Practices Act of 1974: Hearings Before the Subcomm. on Aviation of the Comm. on Commerce on S. 3481*, 93d Cong., 2d Sess. 5 (1974). Because the Postal Service compensated foreign carriers at the UPU rate for carrying United States mail to foreign countries, the bill in effect mandated that United States carriers receive the UPU rates as well.

higher than fair and reasonable rates for such services. The Secretary of State and the Postmaster General shall oppose any present or proposed Universal Postal Union rates which are higher than such fair and reasonable rates.

(3) The Civil Aeronautics Board shall act expeditiously on any proposed changes in rates for the transportation of mail by aircraft in foreign air transportation. In establishing such rates, the Board shall take into consideration rates paid for transportation of mail pursuant to the Universal Postal Union Convention as ratified by the United States Government, shall take into account all of the ratemaking elements employed by the Universal Postal Union in fixing its airmail rates, and shall further consider the competitive disadvantage to United States flag air carriers resulting from foreign air carriers receiving Universal Postal Union rates for the carriage of United States mail and the national origin mail of their own countries.

49 U.S.C. § 1376(h)(2) & (3).

### III

### *Interpretation of Section 4*

A. Consideration of UPU Rates and UPU Ratemaking Elements

█ Section 4, FCPA, which we are called upon to construe, sets forth three factors that the CAB must consider. (1) The Board is to "take into consideration" current UPU rates. (2) The Board is to "take into account" all of the UPU ratemaking elements. (3) The Board is to "further consider" the competitive disadvantage suffered by American carriers as the result of the payments of UPU rates to foreign air carriers.

The carriers do not argue that the CAB was required to adopt UPU rates for domestic carriers. As the legislative history we have set forth establishes, that course was rejected by Congress. The carriers' position, however, is that Congress mandated that the rates here involved be increased to reduce the disparities between UPU and CAB international mail rates. The carriers

view the CAB action as a "head–on conflict" between the Congress and the agency which has "refused to comply with a clear congressional instruction to increase international air mail rates."

We have no difficulty in agreeing with the carriers that the Congress in enacting the FCPA believed and expected that its passage would result in a rate increase. This is hardly surprising because at the time of its enactment in 1974, rates had not been adjusted since 1968 despite a doubling of the carriers' fuel costs and other inflationary increases in expenses. In fact, the CAB did grant temporary rate increases in 1974 and 1975 pending consideration of final rates.

There are some expressions of Congressional opinion, particularly of Congressman Murphy, whose efforts to mandate UPU rates were unsuccessful, that the amendment ultimately accepted would require the CAB to adjust rates upward to "move closer to that UPU rate." 120 Cong.Rec.H 12277. On the other hand, the Senate floor manager, Senator Cannon, emphasized that the amendment "continues to leave with the CAB the responsibility for setting fair and reasonable air mail rates at whatever level the Board finds appropriate." 120 Cong. Rec.S 21807. While Congressman Jarman stated in debate that he agreed with Congressman Murphy's position, he also declared that "the amendment leaves with the CAB the responsibility to fix fair and reasonable rates for international airmail . . . ." 120 Cong.Rec.H 12277.

We conclude after reviewing the legislative history that while Congress expected that rate increases would ensue by the passage of Section 4, FCPA, it did not intend to subsidize domestic mail carriers. The Congress believed that consideration of UPU criteria would increase rates but nevertheless refused to divest the CAB of its traditional ratemaking function.

Ultimately of course we must examine what the legislation enacted actually provided. It is significant that in enacting the FCPA the Congress did not repeal or amend

Section 406(a) of the FAA. That section basically authorizes the CAB to fix "fair and reasonable rates." 49 U.S.C. § 1376(a). The amendment as we have noted requires the CAB to "take into consideration" UPU rates and to "take into account" all of the UPU ratemaking elements.

Substantially the same statutory language was employed by the Congress when it authorized the Secretary of Agriculture to allot refined sugar quotas in Section 205(a) of the Sugar Act of 1948. That section provided that the Secretary should make allotments "by taking into consideration" three factors. In construing this language the Supreme Court held that the Secretary was under a duty "merely to take 'into consideration' the particularized factors. The Secretary cannot be heedless of these factors in the sense, for instance, of refusing to hear relevant evidence bearing on them. But Congress did not think it was feasible to bind the Secretary as to the part his 'consideration' of these ... factors should play in his final judgment—what weight each should be given, or whether in a particular situation all three factors must play a quantitative share in his computation." *Secretary of Agriculture v. Central Roig Refining Co., et al.*, 338 U.S. 604, 611–12, 70 S.Ct. 403, 407, 94 L.Ed. 381 (1950); accord, *American Airlines v. CAB*, 495 F.2d 1010, 1017–18 (D.C.Cir.1974).

We do not read the mandate that the CAB consider UPU rates and UPU ratemaking elements to mandate any more than it says, *i. e.*, mere consideration, and not such consideration as to require a rate increase, even though that result was anticipated. The proper weight to be accorded ratemaking factors inevitably varies from case to case and typically turns on matters peculiarly within the expertise of the ratemaking agency. *Baltimore & Ohio R. Co. v. United States*, 345 U.S. 146, 150, 73 S.Ct. 592, 594, 97 L.Ed. 912 (1953); *American Airlines, Inc. v. CAB, supra*, 495 F.2d at 1017.

There is nothing in the language of the FCPA which mandates a raise in rates, and isolated comments in the legislative history of Section 4 cannot be considered when the language of the FCPA is clear. *United States v. Public Utilities Comm.*, 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 (1953); see *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979) (remarks of single legislator, even the. sponsor, not controlling in analyzing legislative history). We conclude that our function here, paying due deference to CAB expertise, is to determine whether the agency afforded due consideration to the UPU rates and ratemaking elements in fixing fair and reasonable rates.

## B. Competitive Disadvantage to United States Carriers

Section 4, FCPA also requires the CAB to "further consider the competitive disadvantage to United States flag air carriers resulting from foreign air carriers receiving Universal Postal Union rates for the carriage of United States mail and the national origin mail of their own countries." 49 U.S.C. § 1376(h)(3).

The carriers argue in their joint brief that this language must be interpreted to mean that Congress found that a competitive disadvantage existed; and that in view of this legislative determination the CAB need not and may not examine the issue of competitive disadvantage anew in individual rate proceedings. This position was taken by Pan Am before the CAB but all the other parties agreed that the existence of competitive disadvantage was a factual question to be determined on the basis of the evidence. We agree with the CAB and the Administrative Law Judge that competitive disadvantage is a complex economic concept requiring an analysis of costs as well as revenues. Congress made no such study. It was obviously aware that there was a rate differential between CAB and UPU mail rates.[5] However, whether that

---

5. The Senate and House Reports summarily referred to the "competitive advantage" enjoyed by foreign air carriers because of the discriminatory compensation practices employed by both foreign governments and the United States against American carriers. See

differential constitutes a competitive disadvantage is to be determined by the CAB, in view of the circumstances prevailing in the ratemaking proceeding, and if it exists is a factor to be considered by the CAB in fixing a rate. Whether there was substantial evidence to support the CAB finding that no such disadvantage existed here we leave to later in this opinion.

We disagree with that part of the CAB opinion which indicated that UPU rates and ratemaking factors were only to be considered if a competitive disadvantage was found. The clear meaning of Section 4 is that in fixing fair and reasonable rates the CAB must consider UPU rates and elements whether competitive disadvantage exists or not. Each of the three factors is entitled to separate treatment, and a decision that no weight should be given to one does not eliminate the necessity of addressing the others. The point is really academic, however, because the CAB opinion did fully consider each of the UPU factors despite its finding that no competitive disadvantage existed, in full compliance with the mandate of Section 4.

### IV

*Application of the Statutory Factors to the Instant Proceeding*

The joint brief of the carriers is for the most part devoted to what it considers the jugular issue before this court, namely that Section 4, FCPA mandates higher rates. Their reply brief states, "We have intentionally side stepped argument about the reasonableness of the cost methodology actually employed by the CAB and instead have focused our argument on the clear issue of the CAB's cavalier disregard of the mandates of the FCPA ... We make no concession that what the CAB did was reasonable. We simply argue that disregarding the FCPA was so clearly unlawful that the decision below should be overturned."

S.Rep.No.93–1257, 93d Cong., 2d Sess. 3–4 (1974); H.R.Rep.No.93–1475, 93d Cong., 2d Sess. 4 (1974), U.S.Code Cong. & Admin.News 1974, p. 7461. As the CAB noted, however, "there is no indication that Congress was satisfied that it could make a better determination

As we have indicated, we interpret Section 4 not to mandate rate increases but rather to require the CAB to consider the statutory factors in arriving at a fair and reasonable rate. Our inquiry then is whether the CAB gave appropriate consideration to these factors. In making this determination, we are mindful that the ratemaking process presents technical complexities and is not subject to mathematical precision, so that we must accord deference to agency expertise. *New York v. United States*, 331 U.S. 284, 328, 67 S.Ct. 1207, 1230, 91 L.Ed. 1492 (1947); *National Ass'n of Greeting Card Publishers v. United States Postal Service*, 607 F.2d 392, 401 (D.C.Cir.1979).

■ Before turning to the CAB's consideration of and the weight given to the statutory factors, we first address the arguments of Northwest in its supplemental brief which do expressly attack two facets of the costing methodology adopted by the CAB.

### A. Space Based Methodology

Northwest first challenges a major determination of the CAB to apply a space based costing methodology rather than one based on weight in assessing the capacity costs allocable to passenger and cargo traffic.[6] Both the Administrative Law Judge and the CAB found that most flight segments are space limited rather than weight limited. There was evidence presented at the hearings that in the great majority of combination flights in the areas at issue, the belly compartments were "cubed out" before "weighing out." While at one time the technological characteristics of aircraft were such that the weight of the payload had to be restricted for long distance operations, modern improvements generally have

on the issue than could the Board." Opinion and Order 78–12–159, at 22.

**6.** Capacity costs are those incurred in the actual operation of an aircraft, as opposed to noncapacity costs which are associated with terminal operations and ground and sales services.

eliminated weight as a restriction on the range of the airplane. The plane usually runs out of space before weight restricts its operation. Evidence to the contrary was limited and for the most part was not forthcoming from the carriers, although such data was requested at the prehearing conference. Therefore, the CAB's decision to allocate total capacity costs among passenger and cargo compartments, and then among freight and mail, on the basis of the relative space devoted to each type of traffic, was supported by the record. Moreover, this determination is consistent with prior CAB holdings that space is the primary physical limitation in investigations affecting domestic mail and freight rates. See, e. g., Nonpriority Mail Rates, Order 70–4–9/10 at 6 (April 2, 1970).

### B. Load Factor Adjustment

The cargo load factor of an aircraft is the percentage of its available cargo capacity actually utilized in a given operation. Northwest assails the CAB's application of a load factor adjustment to assign a proportionally higher share of the costs of unused combination (passenger and cargo) aircraft belly compartment capacity to passenger service (i. e. passenger luggage) than to freight or mail. The Board adopted a load factor adjustment of 53.1 percent–that ratio was determined by averaging the international combination carriers' belly load factors for all–cargo operations for the period 1974–1977. Under this standard, the unused belly capacity up to the 53.1 percent load factor is allocated to passenger service. The remaining unused capacity above the 53.1 percent factor is allocated to freight and mail proportionately to the capacity used by each traffic. The basic premise of the CAB allocation cannot be disputed–combination aircraft are primarily scheduled in response to passenger demand so that passenger scheduling considerations are largely responsible for the excessive unused belly capacity in these aircraft. Capacity costs allocable to mail become of minor importance. Utilizing an all–cargo load factor thus gives some approximation of the load factors the combination aircraft belly compartments would be anticipated to

achieve in the absence of passenger scheduling considerations. While there may be some question of the mathematical precision of the load factor employed by CAB, we cannot characterize it as arbitrary or capricious. Therefore we reject the challenge made by Northwest to the adoption of this cost adjustment.

### C. The UPU Factors

UPU rates are based on world airline common economic costs, expressed in a unit cost per revenue ton–kilometer, and weighted by the amount of international air mail transported by each airline. We have already determined that the CAB appropriately rejected the weight based methodology employed by the UPU in favor of the space method which more accurately reflects the costs of the service.

After subtracting certain passenger and publicity service costs, the UPU unit cost is augmented by the addition of five ratemaking elements. The CAB's consideration of each of the five elements will be discussed seriatim.

1. *Priority of Service* –The UPU places a value on this element of ten percent of the net common operating expenses assigned to mail. Priority is the cost of reserving cargo space set aside for mail. It is undeniable that priority mail has boarding priority over other categories of cargo traffic, and the extent to which this supports a cost allocation was certainly considered by the CAB. The record supports the CAB's conclusion in its initial opinion that in the case of combination aircraft there was no reliable evidence that mail boarding priority had any cost causative consequences. Pan American was the only carrier which presented evidence of the amount of freight displaced by priority mail. In 1975 only 3.3 percent of its total international freight ton–miles were displaced by priority mail and only half of that traffic was ultimately lost by that carrier. While theoretically mail boarding priority over freight constitutes a basis for a cost differential, there is insufficient evidence in the record to establish that providing capacity for anticipated

air mail has in fact been a significant cost factor. International carriers on average operate with their cargo compartments more than half empty. As the CAB noted, there was no showing that the carriers ever added extra capacity, even during peak periods, to accommodate both mail and freight. We cannot find, therefore, that the rejection by the CAB of any cost allocation for this factor constitutes arbitrary agency action.

Although MOM is not entitled to the same priority in boarding as is accorded priority mail, in its initial opinion the CAB fixed a rate for MOM that was actually higher than the rates for priority mail. It followed that MOM traffic would be tendered as "priority" mail and thereby obtain better service, but at a lower price than if it was offered under the MOM category. In its Order on Reconsideration the CAB recognized the anomaly and agreed to a merger of MOM and priority mail into the same class of service with a single rate. Yet this too created a problem. Unlike priority mail, more than sixty percent of MOM traffic is carried on all–cargo aircraft. Moreover, international all–cargo aircraft operate at load factors which are significantly higher than those experienced in combination aircraft. It could be reasonably anticipated, therefore, that the boarding priority now afforded to MOM traffic would significantly displace commercial freight with resulting cost consequences. Flying Tiger, for example, argued that in peak periods on certain segments in many flights virtually every pound of priority mail is carried at the expense of commercial freight. In light of this the CAB established a ten percent priority adjustment in the capacity costs allocated to the combined class of MOM and priority mail for all–cargo operations. In effect, the CAB did give consideration to this UPU element when it was cost justified.

The DOD and Postal Service, although apparently the beneficiaries of overall rates even lower than they proposed, now argue that the ten percent factor was not justified by the evidence. That some priority factor was justified is apparent from the record.

Unlike the case of passenger aircraft where the mail traffic is essentially a by–product, the record does support the finding that the merger of MOM and priority mail would create a space problem for the all–cargo carrier. DOD and the Postal Union do not take issue with the fact that the initial opinion of the CAB created an anomalous rate structure providing a higher rate for MOM although it had a lower boarding priority than priority mail. Indisputably MOM was in the main carried by all–cargo aircraft with significantly higher load factors than those of combination aircraft. By the same token, since both freight and MOM previously had been accorded the same boarding priority, mathematical precision in fixing the percentage of priority adjustment was not possible. Those carriers advocating priority cost adjustments had all claimed that a ten percent adjustment was appropriate, no carrier claims otherwise now, and we therefore believe that the judgmental determination made by the CAB in allowing this amount was within its discretion. In any event the CAB in its Order on Reconsideration did expressly invite the parties to propose and to justify an alternative factor in the light of actual experience with the merged classes of mail. The record does not indicate that any such data has as yet been submitted. Where an agency's factual determination is primarily based on judgment or prediction, complete factual support in the record is not possible or required. Assessment of fair cost, as here, often involves deductions based on its expert knowledge. See *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 813–814, 98 S.Ct. 2096, 2120–21, 50 L.Ed.2d 697 (1978).

2. *Special Handling*—Special handling of mail, which reflects such treatment accorded to mail as separate loading and extra security provisions, is valued by the UPU at five percent of total costs and is applied to common operating expenses as a current cost of mail. Under the CAB methodology, noncapacity costs common to baggage, freight and mail are distributed in proportion to each traffic's share of the total tons

of cargo and baggage transported. The carriers argued, and the Administrative Law Judge agreed, that the five percent additional charge for mail was justified by the costs incurred in maintaining equipment and personnel over and above commercial shipments due to the short time limits given for handling mail. However, the record fails again to provide any evidence which would justify the CAB in quantifying the special handling costs of mail assuming that this traffic creates greater costs than freight.[7] In the absence of such evidence the refusal of the CAB to add the five percent extra cost above those already provided for this factor cannot be deemed arbitrary. Certainly this element of UPU ratemaking was considered and its rejection reasonably supported.

3. *Service Development* – UPU assigns a value of fifteen percent to this element, and then adds it to the whole of current costs attributable to mail including common operating expenses plus the adjustments for priority and special handling. This element is designed to allow postal administrations to contribute toward the cost of new air mail postal services and facilities as well as technical progress in aviation through research and experimentation which will permit participating administrations to share in the common benefits thus achieved. The carriers state that more efficient jet airplanes in the last decade have allowed "vastly superior service" to be offered to the Postal Service "at lower costs." A review of the record reveals once again that this UPU element was fully considered by both the Administrative Law Judge and the CAB, which gave it no quantitative weight. Significantly, the Administrative Law Judge and the CAB found that the service development factor was initiated as a subsidy primarily to promote the growth of air service, particularly in developing countries. UPU documents in the record indicate that this factor *"should disappear in the fairly near future* and should therefore be regu-

larly reviewed." (emphasis in original). The United States is hardly underdeveloped and the capacity of the carriers before us to handle mail cannot be questioned. The CAB moreover pointed out that the amortization of costs associated with the development of aircraft and services is already recognized in the costs it has assigned to mail. We find no reason at all to disturb the agency finding which rejects this special adjustment.

4. *Value of Service* – The UPU accords this element a value of ten percent, and it is conceded by the carriers to be a non-cost factor. Neither the Administrative Law Judge nor the CAB attached any value to this element in determining the rates here involved. The value of conveying international mail by air is admittedly nebulous and difficult to pinpoint with any degree of precision. The position of the joint carriers on this appeal, fairly summarized, is that they perform a uniquely valuable service to the public. According to figures submitted to the CAB, the Postal Service charges the public an estimated $11.88 per pound for international air mail while it pays the carrier only about 70 cents for the same pound of mail. The Postal Service's costs of air transportation represented only 12.5 percent of its international air mail revenues in 1974, and even though this percentage continues to decline, the Service raised international air mail rates in 1976. Their brief states, "In simple language, the Postal Service is expropriating virtually the entire benefit of the unique service which the carriers provide." (emphasis omitted). The Postal Service replies that its transportation costs are merely a small fraction of its total operating costs which include domestic transportation of international mail by air and surface, handling, processing, general overhead and personnel. Obviously, the cost to the Postal Service cannot be limited to the cost of actual air carrier transportation. However, even assuming that a dis-

---

7. TWA offered a comparison of the different functions required to process mail and freight, which showed only that some functions required to process mail are not required to proc-

ess freight, and *vice versa*. No carrier provided an analysis of the costs of performing the various functions.

parity exists, the fixing of the postal rates charged by the Postal Service to its mail customers is not within the jurisdiction of the CAB. Postage rates are concededly high but it does not follow that the rates paid to the airlines are therefore unreasonably low. As the CAB pointed out, the Postal Service is required to use United States carriers for the transportation of mail here involved and if a value of service adjustment were applied in effect the monopoly powers of the carriers would obligate the Postal Service to pay rates in excess of costs, which the CAB accordingly refused to assess.

This argument of the CAB raises a fundamental issue. As already discussed, Section 4 of the FCPA requires the CAB to give consideration to all of the UPU rate-making elements. Value of service is a non–cost item. Can the CAB therefore properly reject this element simply because it is a non–cost item or does Section 4 require that it be given some quantitative value in fixing rates?

We believe that the legislative charge to the CAB is to establish "fair and reasonable rates"–we agree that the carrier is entitled to a fair return in addition to its costs. However, there is nothing in the statute which mandates the acceptance of an elusive value of service element in addition to a fair return on carrier investment. "A reviewing court under familiar jurisdictional principles may not, and under human limitations generally could not, reassess the weights given by a rate–making agency to different factors, absent a legislative direction as to precisely what gravity each factor bears. All that the court may properly do is consider whether the agency did take into account all the relevant factors and no others." *Association of Am. Pub., Inc. v. Governors of U. S. Postal Serv.,* 485 F.2d 768, 774–75 (D.C.Cir.1973).

Moreover, the CAB's refusal to attach weight to the value of service factor was not based solely on a wooden rejection of any non–cost factor, but also on a determination that refusal to apply this element would not hinder the carriers' chances of obtaining a fair return on their investment. According to the CAB, "Since there is no reason to believe that the carriers will be unable to generate sufficient revenue from all services when they are priced at marginal costs, there is no indication that markups on the costs we have allocated to mail are required."

In short, we cannot find that the CAB failed to consider the UPU factor of "Value of Service," nor can we characterize its refusal to accord that element any weight as a flouting of the statute we are asked to construe.

5. *Return on Capital/Profit Margin* –The UPU has selected a figure of seventeen percent applied as a markup percentage to the sum of all other costs to represent the value of this final UPU element, which amounts to a less than sixteen percent return on investment (ROI). The Administrative Law Judge decided that 13.5 percent is a fair and reasonable ROI for international air mail services. The CAB rejected that calculation and decided that twelve percent was a fair and reasonable amount for this factor, as it had previously determined in the area of domestic operations. The CAB adhered to that finding in its Order on Reconsideration. On appeal the carriers urge that the twelve percent rate of return adopted by the CAB is not supported by the evidence in the record. The carriers concede that the CAB has used a twelve percent figure in passing on international passenger and freight rates in the past but stress that in none of these cases was there an evidentiary hearing in which the rate of return issue was ever tried. The carriers urge that the UPU rate of seventeen percent be adopted.

There is nothing in the record before us that would indicate support for a rate of seventeen percent. The carriers' argument in effect is that while twelve percent may be a fair and reasonable return for domestic service, there are unique risks incidental to international operations which warrant a greater return. These factors include severe currency devaluations, arbitrary and excessive landing fees, frequent work stop-

pages and foreign governmental restrictions. The carriers further contend that the cost of debt is increasingly high and should be reflected in a higher rate of return.

The CAB did not dispute that there are risk factors in international traffic, but denied that they have any substantial impact on mail service as distinguished from passenger or freight service. The CAB further found that there was no evidence to support the proposition that the alleged risks should result in a rate of return higher than twelve percent which it has utilized in the past for both domestic and international service. The carriers also argue that shortly after its Order on Reconsideration the CAB did use a fifteen percent rate of return in one international rate case. Order No. 79–9–75 (Sept. 4, 1979). However, that order involved not international air mail rates but passenger fares. What evidence was adduced in that proceeding in any event is not before us.

With respect to the costs of capital, the CAB decided that the carriers had provided "no basis for rejecting a reasonable assumption that they incur debt and raise equity capital on a system basis;" i. e., without regard to the area of operations. Moreover, even if costs of capital could be adequately apportioned between domestic and international operations, the CAB found that the carriers had produced no probative evidence of such costs.

Although there is plausibility to the argument that the risks incidental to international traffic are greater than those for domestic operations, we cannot on the record before us fault the CAB for employing the twelve percent ROI standard which it had utilized in prior domestic and international air traffic cases. While the carriers may be correct in principle, the record fails to establish any quantitative basis for increasing the ROI for international *mail* rates, which the CAB found to be least affected by the risks suggested. The CAB opinions assuredly considered and enumerated the risk and cost of capital elements relied upon by the carriers and found that they were insufficient. The weight and significance to be attached to them depends upon agency expertise and on the record we are not persuaded that the judgment exercised was arbitrary or capricious.

### D. Competitive Disadvantage

We have already held that Section 4 does not constitute a congressional finding that any competitive advantage actually existed in favor of foreign over domestic air mail carriers. That is again a determination requiring a complex and periodic economic analysis not undertaken by Congress.

The CAB expressly considered this final statutory factor, and found no support for the carriers' assertion that they were competitively hindered by the disparity in compensation. Unquestionably, there is a differential between UPU rates paid to foreign carriers and the CAB rates paid to domestic carriers. That differential favors the foreign carriers–but there is no evidence at all in the record to establish any competition between foreign and domestic air mail carriers. Foreign air carriers, as we have pointed out, receive civilian mail from the Postal Service only as a last resort and have practically no military mail business. Moreover, there is no support for the proposition that higher mail rates enjoyed by foreign carriers enabled them to take passenger and freight business away from domestic carriers, or that the mail rate differential made the foreign carriers more profitable in general. In fact, the record establishes that domestic international carriers are more cost–efficient than their foreign competitors.[8] The CAB's determina-

---

8. Specifically, the CAB found:

"[T]he volume of mail carried is a key variable, and in this respect the U.S. carriers individually and collectively have the overwhelming advantage. Thus, if both U.S. and foreign flag carriers have more unused than used capacity in their aircraft bellies, as we have found in this proceeding with respect to the former, so that they are able to carry all of the mail tendered at little or no incremental capacity cost, then the carriers carrying the largest volume of mail should have the advantage in profitability. And, to the extent that foreign carriers have less unused capaci-

tion that the rate differentials created no competitive disadvantage for American carriers on the evidence before it was clearly appropriate.

## V

*Prospective Application of the Final Rates*

█ DOD and the Postal Service argue that the decision of the CAB to make the final rates prospective only was arbitrary and capricious and contend that they were given insufficient notice that these rates might be prospective and therefore had no opportunity to present evidence in favor of retroactive application.[9]

Under Section 406(a) of the FAA, the CAB is authorized to make "rates effective from such date as it shall determine to be proper." 49 U.S.C. § 1376(a). The CAB is authorized, but is not required, to apply its rates retrospectively to the date the proceeding commenced. *Transcontinental & Western Air, Inc. v. CAB*, 336 U.S. 601, 605–06, 69 S.Ct. 756, 758–59, 93 L.Ed. 911 (1949). In fixing these new rates, which were admittedly lower than had been anticipated by the Congress and probably lower than those expected by either DOD or the Postal Service, the CAB did make a major departure from prior practice by adopting a space based methodology rather than one based on weight. It has been held that an agency decision to apply rates premised on the initiation of a new policy prospectively is presumptively valid. *City of Chicago v. FPC*, 385 F.2d 629, 642 (D.C.Cir.1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

We see no reason to characterize the CAB determination of prospective application for rates employing a new methodology as any abuse of its discretion clearly vested by Section 406 of the FAA. The temporary rates which it did adopt are not properly characterized as speculative but reflected the best available estimate of costs for international mail service at that time. There was undoubtedly a general belief that the airlines were suffering economically and that some assistance in the form of increased international mail rates was appropriate. "Any approval of rates under such conditions would be subject to revision once more complete information is obtained." *Moss v. CAB*, 430 F.2d 891, 901–02 (D.C.Cir.1970). It developed after a full hearing that whatever the financial problems afflicting the carriers here involved, the temporary mail rates overcompensated them. However, the determination that an interim rate was erroneous does not compel retrospective application and consequent refund. See *Moss v. CAB*, 521 F.2d 298, 308–09 (D.C.Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976). A refund here would require the carriers to pay back some $99 million which the CAB properly characterized as an unfair burden for the industry as a whole to shoulder. It would amount in effect to almost 100 percent of the 1978 international service mail revenues of the domestic carrier parties. Since the rates of carriers and other utilities fixed by public authorities are usually prospective, *Transcontinental & Western Air, Inc. v. CAB, supra*, 336 U.S. at 605, 69 S.Ct. 756, 93 L.Ed. 911, under the circumstances we see no merit at all in the claim that the agency abused its discretion in so fixing them here.

The contention of the Government petitioners that they had no notice that the

ty and hence higher incremental costs, their net mail revenues would be even lower relative to U.S. carriers. In the final analysis, therefore, looking at both fact and logic, we agree with Judge Present that this record will not support a finding that the U.S. flag carriers suffer any competitive disadvantage as a result of the higher mail rates paid their foreign competitors."
Original Opinion and Order 78–12–159, at 23–24 (footnotes omitted).

9. The temporary rates established by the CAB covered the period from March 8, 1974, the date the proceedings were commenced, through the date the final rates were established, on December 21, 1978. The CAB permitted two temporary rate increases apparently totalling some twenty percent. See Order 75–2–3 (Feb. 3, 1975); Order 74–10–15 (Oct. 4, 1974). The final rates, however, were considerably lower; indeed, the CAB characterized them as among the lowest that could be cost justified on the record.

temporary rates might become final for all or part of the open rate period is also without merit. The CAB's discretion to apply new rates prospectively is permitted by statute and by its past practices, as we have pointed out. Therefore, the question of prospective application was in issue from the beginning of the proceeding. That issue was addressed by the CAB both in its original opinion and on the Order on Reconsideration, and in the latter the CAB entertained the identical arguments that the Postal Service and DOD now claim they had no opportunity to make.

The claim of surprise by the Government petitioners is similarly not persuasive. The CAB afforded all of the parties the opportunity to present their views at a prehearing conference, at the hearings before the Administrative Law Judge, in their briefs and reply briefs, on oral argument and on the Order on Reconsideration. Under these circumstances there was no lack of procedural due process.

For the foregoing reasons the CAB's order setting final rates for the provision of international air mail service by United States air carriers, and its decision to apply those rates prospectively from the date of final decision, are affirmed.

MANSFIELD, Circuit Judge (Concurring in part and dissenting in part):

Except as noted below, I concur in Judge Mulligan's thorough and carefully reasoned opinion.

I agree that our role is limited to determining whether the CAB, in fixing rates under the Federal Aviation Act, 49 U.S.C. § 1376(a), fairly took into consideration, as required by § 4 of the Fair Competitive Practices Act of 1974, 49 U.S.C. § 1376(h)(3), current UPU rates, all UPU rate–making elements, and any competitive disadvantage suffered by American carriers by reason of the payment of UPU rates to foreign carriers. However, I believe that

where, as here, Congress obviously intended the CAB to give sympathetic consideration to these matters, the burden should be on the CAB to demonstrate that such consideration was given rather than rely simply on a showing that there was supporting evidence and an absence of arbitrariness. As the majority correctly notes, the Congress clearly intended and expected that the CAB would increase the American carriers' rates. Otherwise the enactment of § 4 would amount to a pointless exercise.

The CAB has demonstrated that it carefully considered all the matters and rate–making elements referred to in § 4 except for the UPU rate of return on investment, which converts to 15.58% as compared with the 12% figure adopted by the CAB in the present case. In my view the record fails to support the 12% figure as against the higher UPU figure other than to show reliance by the CAB upon a stipulated rate (as distinguished from one determined after evidentiary hearing) of 12% used in the earlier, outdated Domestic Passenger Fare Investigation 71–4–58, April 9, 1971. Against this we find that the ALJ, recognizing Congress' intent, recommended a rate of 13.5% as fair and reasonable. Moreover, only two months after its Order on Reconsideration in the present case, which adopted the 12% figure, the CAB used a 15% figure in another international rate case, Order 79–9–75, Sept. 4, 1979, thus demonstrating that there is nothing sacred about the 12% figure and that a higher figure may be fair and reasonable. The later case cannot be distinguished on the ground that it fixed a rate of return on passenger traffic as distinguished from mail traffic, since the 12% figure relied on by the CAB originated in an old domestic passenger case.

In contrast to the CAB's lack of evidentiary support for its 12% figure, the American carriers adduced substantial evidence [1] that international service (i. e., joint carriage of passengers and mail) faced greater risks than those encountered in domestic service, including severe currency devalua-

---

1. Witnesses who testified to these matters included Steven G. Rothmeier, Manager of Economic Analysis for Northwest Airlines, Inc., Eli C. Hecht, Vice President of Audits and Taxes for Seaboard Airlines, Harry Kimbriel, expert witness called by the U.S. Postal Service, and Kenneth J. Holden, Director of Transportation Analysis for the U.S. Postal Service.

tions, foreign government restrictions, foreign work stoppages and foreign civil unrest, terrorist bombings and sabotage. In addition there was evidence, of which we could now probably take judicial notice, that the cost of debt would sharply increase. Indeed, according to newspaper accounts over the last few years, this cost has skyrocketed.

The CAB's attempted but unsupported cost distinction between foreign passenger and mail service (which are principally joint), its payment of mere lip service to uncontroverted proof by the petitioners of need for a higher rate of return, and its adoption of a 15% rate in another case, leave me with the distinct impression that the CAB has not only failed to give appropriate and sympathetic consideration to the UPU 15.58% "rate of return" factor as mandated by § 4, but has also disregarded affirmative proof in support of a figure higher than 12%, which might approximate the UPU figure.

For these reasons I would remand the case to the CAB for further consideration of the rate of return factor in light of the evidence offered by petitioners, the intervening sharply increased cost of debt, and the Board's use of a 15% rate elsewhere.